COMMONWEALTH *vs.* COMPTON BOWMAN.

Suffolk.    September 13, 1977. — December 1, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Homicide. Self-Defense. Practice, Criminal,* Capital case, Charge to
jury, Exceptions: failure to save exception.

Evidence at a murder trial warranted a finding that the defendant was
guilty of murder in the second degree. [765-767]
Where it appeared at the trial of a defendant charged with murder in
the first degree that the defense counsel affirmatively assented to the
judge's omission of an instruction on manslaughter, this court de-
clined to exercise its powers under G. L. c. 278, § 33E, to reduce the
verdict of conviction of murder in the second degree or to order a
new trial. [767-768]
At a murder trial in which the defendant raised the issue of self-
defense, the charge to the jury, taken in its entirety, fairly put the
burden on the Commonwealth to negate the issue of self-defense.
[768]

INDICTMENT found and returned in the Superior Court
on August 15, 1975.

The case was tried before *Lynch,* J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*Thomas Hoffman* for the defendant.

*Robert J. McKenna, Jr.,* Assistant District Attorney,
for the Commonwealth.

KAPLAN, J.    On indictments for murder in the first
degree on his companion Yvonne and their two-year-old
son Marcus, the defendant Compton Bowman was con-
victed of murder in the second degree of Yvonne and
acquitted of the murder of Marcus. The defendant argues
on his appeal from the conviction that on all the evidence
this court ought to use its dispensing power under G. L.
c. 278, § 33E, to order entry of a manslaughter verdict (or

possibly order a new trial). Section 33E is also invoked in respect to the omission of the trial judge to instruct on manslaughter, and an alleged error by him in his instructions on self-defense. We conclude that this is not a proper occasion for granting any extraordinary § 33E relief from the jury's verdict, which is amply supported.

About 6:15 A.M., Friday, May 23, 1975, the defendant appeared at Faulkner hospital, Jamaica Plain, exhibiting a bullet wound at his left wrist and forearm, but otherwise unbruised. During the short period of his admission and treatment (the wound was minor), the defendant made statements to a medical technician, a nurse, and three police officers, which taken together told the following story in substance.[1]

Earlier that morning he had quarrelled with his girl friend because she had informed against him to the immigration authorities and tried to get him deported. He had shot her and their son. In speaking to the medical technician (to whom he evidently was more forthcoming than to the others), the defendant said he shot the child because he didn't want to abandon him to the care of strangers; to an officer he said he thought the child got in the way of the shooting. He said he was shot; he did not know how he came to be struck during the episode. He had bought the gun at some earlier date from a man at Massachusetts Avenue and Tremont Street, Boston.

He said further at the hospital that he had gone to New York in connection with his immigration problem; making no progress there, he returned to Boston on the afternoon of Thursday, May 22. That evening he visited an immigration lawyer in Boston whom he had chosen from the yellow pages of the telephone book. He came home about 9 P.M. and slept there. In the early morning, as he was about to enter his car, he realized he had left his keys in the house. The trouble started when he reentered the

---

[1] The trial judge found on voir dire that the statements were made voluntarily. He put the question of voluntariness again to the jury under proper instructions, following the usual practice in the Commonwealth.

house. After the shooting he drove off seeking a police station. He found a post office, and after speaking to a woman there, proceeded to Faulkner hospital.

In consequence of the defendant's statements, and while he was still being treated at the hospital, a police car was dispatched to the defendant's house at 364 Blue Ledge Drive, Roslindale. On the floor of the second-floor bathroom were found the bodies of Yvonne and Marcus, both dead. The place was disordered, with Yvonne's hair curlers and slippers strewn about, which might suggest a struggle. A .22 caliber revolver with a six-chambered cylinder rested open on the toilet seat. It can be taken that all chambers had been discharged in the encounter in the bathroom and that the several wounds inflicted on the victims were traceable to bullets fired from that gun. Yvonne had been wounded frontally in the chest, the bullet penetrating her heart; a second wound was caused by a bullet entering the back of her head; and a third resulted from a bullet entering the right side of her neck just above her collar bone. The first and second wounds were grievous enough to cause death. Marcus was killed by a bullet in the head. It could not be determined at what distance from the bodies the gun was fired. The spent bullet extracted from the defendant's forearm came from the same gun. When arrested at the hospital, the defendant had in his pocket seven live .25 caliber bullets and one live .22 caliber bullet; another live .22 caliber bullet was discovered at the autopsy loose in Yvonne's clothes.

What has been recounted sketches the prosecution's case in chief on the murder indictments, and on this and the rest of the evidence (developed below) the Commonwealth contended that the defendant intentionally killed Yvonne with a connected killing of the child,[2] suffering an injury as Yvonne fought back. The defense postulated

---

[2] A theoretical inconsistency between acquittal of the murder of Marcus and conviction of the murder of Yvonne would not render the conviction erroneous. See *Commonwealth* v. *Scott,* 355 Mass. 471, 475 (1969); *Dunn* v. *United States,* 284 U.S. 390, 393 (1932).

that Yvonne had been the aggressor (using a revolver not known to the defendant), and that all the shots were fired by Yvonne, the defendant having acted throughout in self-defense without excessive force to ward off her attack, thereby incurring his injury.

Taking the stand in his own behalf, the defendant denied that he had made various statements attributed to him by the police officers who had seen him at the hospital; he had told them merely, so he testified, that Yvonne and Marcus had been shot and that he also had been shot.

Next, as to motive. The defendant had received an official letter on Saturday, May 17, requiring him to appear at a Boston immigration office to answer to his status. A native of British Guiana, the defendant had long overstayed his time as a "visitor," and had been ordered by the immigration authorities in New York on July 16, 1969, to leave the country by August 15, 1969. About this time the defendant fled to Boston and took up residence there.[3] A deportation warrant had been issued against him on May 13, 1970.[4] The defendant said, however, that he had not been seriously concerned about deportation; though he did make the trip to New York, it was for "relaxation"; and the Boston lawyer, at the meeting which in fact occurred on Thursday evening, May 22, had held out hope at least of postponing the event.[5] According to the lawyer, the defendant said at that meeting that he suspected Yvonne had informed against him.

The defendant in his testimony pictured the events of the Friday morning thus. On returning to the house from the car and going to the bathroom to wash, Marcus trailing along, he was met by Yvonne who said he had taken

---

[3] The defendant's name appearing on his passport was Williams (his mother's maiden name), but he regularly used the name Bowman and was so known in Boston.

[4] Notice of the warrant was sent by certified mail to the defendant at a New York address but was returned undelivered.

[5] In the evening interview, the lawyer had only the defendant's incomplete account of the case without the documentation.

something from her room. The defendant admitted he had removed two picture albums and told her — what he had been contriving over a period of time but had concealed from her — that he was leaving her and moving elsewhere and would clear the house of his furniture. She asked about immigration — this, he testified, was his first sign that she knew he had any immigration problem at all. He answered that he now had a lawyer who was taking care of the matter. She left the bathroom and returned in a moment with a revolver, saying in effect, if they don't send you one way, I'm going to send you another.

The defendant somewhat muted his reasons for leaving Yvonne which were, according to his testimony, that there had been an estrangement over several weeks and that she had been answering business telephone calls at the house by saying that the defendant could not be reached there (when accused, she had denied this). The record leaves Yvonne as a shadowy figure (she is described by others as a "quiet" person). Rather than laying strong emphasis on an hypothesis that she could be stirred to rage and thus to murderous action by the prospect of his desertion,[6] the defendant appeared to urge a mercenary motive on her part for eliminating him, namely, that she wanted possession of the furniture in the house free and clear.[7]

Finally, as to the physical encounter. The defendant admitted to buying a gun at Massachusetts Avenue and Tremont Street, but he said it was a .25 caliber, and he had understood that Yvonne sold it in April when he had gone on a three-day trip to Washington, leaving her without money. However, she had not disposed of some .25 caliber bullets, and he had placed them in a plastic cup in the bathroom. When she came at him with a gun, he thought it must still be the .25, as he knew of no other gun. Seeing his son dead when the shooting was over, he tried to reload the gun with bullets from the plastic cup

---

[6] There was no objective evidence that in fact Yvonne had previously informed against the defendant.

[7] The defendant introduced evidence of the cost of the furniture.

and do away with himself; only then did he find that the bullets did not fit.

In the struggle proper, which the defendant acted out in his version at some length during his cross-examination, he claimed never to have had the gun in his hand until all shots were fired 'and Yvonne slumped from her mortal wounds and released the weapon.

1. Under G. L. c. 278, § 33E,[8] it is appropriate for this court to consider whether the verdict of conviction of murder in the second degree was against the weight of the evidence considered in a large or nontechnical sense — whether, as the defendant argues, the evidence, so considered, justifies a verdict of no more than manslaughter. See *Commonwealth* v. *McInerney, ante,* 136, 140 (1977); *Commonwealth* v. *Jones,* 366 Mass. 805, 808 (1975); *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963). We think the verdict rendered was well founded. It suffices for the present purpose to point to the grave difficulties a jury might feel in crediting the defendant's responses to the case made against him of murder with malice aforethought.

If the defendant vouchsafed at the hospital no more than he admitted at trial, a jury would be left with a doubt how witnesses acquired information indubitably true, such as that an immigration problem existed, or what might explain the witnesses' adding to the defendant's actual statements to them. It may be noted that not even in the defendant's trial account of what he said at the hospital was there any definite accusation that he was set upon by Yvonne.

The defendant sought to make light of the immigration

---

[8] Section 33E, as amended through St. 1974, c. 457, provides in part: "In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (*a*) order a new trial or (*b*) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence."

trouble that faced him, thus weakening the inference that his anger at Yvonne could take lethal form. But a jury would be warranted in thinking that the defendant was seriously disturbed, that the trip to New York was not for idle pleasure, and (accepting the lawyer's testimony) that the suspicion of betrayal by Yvonne, renewing the canker of his immigration status that had been long dormant, was in the defendant's mind well before Friday morning. The causes of the defendant's imminent separation from Yvonne might be thought underplayed in his testimony; they could reinforce his resentment against her at the climactic moment of the homicide. As to Yvonne's mercenary motive, would not the modest value of the furniture be offset in her mind by the prospect of losing the defendant as a provider for Marcus (quite apart from her risking a sentence for murder).

The story of the sale of a .25 caliber gun to cover household expenses would ring more true if the couple were impecunious; they were not. In the struggle itself, according to the defendant we have Yvonne firing repeatedly, and three times into her own body, as the defendant moves in self-defense to avert the threat from himself. Having seen a purported reenactment, the triers could make their inferences about the plausibility of the defendant's account. They might consider the fact that the fatal shots came both from front and rear, that either of Yvonne's wounds could well have extinguished her ability to fire the gun at all, and that the defendant appears to have had physical capacity to overpower the supposed assailant. And, as to the abortive suicide attempt, it may be observed that a live .22 caliber round, fitting the gun, was in the defendant's possession when he was arrested.[9]

Study of the evidence does not incline us to mitigate the second-degree conviction, and the consequences of this view must be accepted even though the crime may have

---

[9] The defendant testified that Yvonne's body was showing some movement as he left the bathroom. He did not attempt to rouse help (he said the telephone in the apartment was out of order).

been an "isolated event" in the defendant's life. See *Commonwealth* v. *Bermudez,* 370 Mass. 438, 443 (1976).

2. The defendant contends that, even though his conviction of murder finds an adequate basis in the evidence, a jury could have found that he was innocent of murder but guilty of manslaughter, and of this possibility he was deprived by reason of the judge's omission to charge on the lesser crime. Cf. *Commonwealth* v. *Corcione,* 364 Mass. 611, 616-618 (1974); *Commonwealth* v. *McCauley,* 355 Mass. 554, 558-562 (1969). By § 33E, he adds, he should be relieved on his acquiescence in the omission, and the result should be a reduction of the sentence or a new trial.

The trial judge was not inclined to see manslaughter as even a minimally permissible verdict. Taking the defendant to have been the aggressor, the judge saw no evidence of a situation of "provocation" and "sudden passion." And assuming Yvonne was the aggressor, the judge doubted manslaughter in the sense of an excessive use of force in self-defense. The defendant's own account excluded this (cf. *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 746 [1975]) and, as the Commonwealth notes, if Yvonne confronted the defendant in a confined space with a gun and wounded him, the defendant would be justified in using deadly force in response, at least until a point where the defendant captured the gun, when the use of the weapon against Yvonne might be murder. Such speculations, however, can be carried too far, and it may be assumed that a charge on manslaughter would not have been irregular. See *Commonwealth* v. *LeBlanc, ante,* 478, 490-492 (1977). But the record shows that the matter was twice canvassed by the judge with counsel, and was also considered by counsel with his client, an intelligent and articulate man.[10] There was not merely passive acquiescence but distinct assent to the omission of a manslaughter charge; and when all the instructions had been given, excluding manslaugher as a possible verdict (and adding, unnecessarily,

---

[10] In 1975 the defendant was employed as an insurance agent.

that there was no evidence of it), the defendant's counsel said he was content. This was a deliberate choice on the part of the defendant consistent with the position on self-defense that he had taken throughout the case, and in all the circumstances we do not feel it would be "more consonant with justice" (*Commonwealth* v. *Seit, ante,* 83, 94 [1977]) to take the uncommon step of relieving the defendant under § 33E and overriding the jury's verdict. As we said in *Commonwealth* v. *Laliberty, ante,* 238, 247 (1977): "We do not regard G. L. c. 278, § 33E, as a procedural device by which a defendant may challenge his own trial tactics." See *Commonwealth* v. *DiPietro, ante,* 369, 390-391 (1977); *Commonwealth* v. *Gouveia,* 371 Mass. 566, 572 (1976); *Commonwealth* v. *LaBella,* 364 Mass. 550, 554 (1974).

3. The charge on self-defense is complained of as erroneously casting the burden of persuasion on the defendant to establish the matter, rather than on the Commonwealth to negate it. No objection was taken at the time although the suggestive decision of *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975), was already on the books, with *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 687-689 (1976), to follow, applying *Mullaney* to the issue of self-defense. We pass over questions of the retroactive application of this rule (see *Hankerson* v. *North Carolina,* 432 U.S. 233 [1977]; *Patterson* v. *New York,* 432 U.S. 197 [1977]), and of the use of § 33E to excuse the failure to object (cf. *Rodriguez* at 692 n.9). For on a reading of the charge as a whole we think it fairly put the burden on the Commonwealth on this issue as on the others.

*Judgment affirmed.*