COMMONWEALTH *vs.* CALVIN T. CADWELL.

Berkshire. October 3, 1977. — February 1, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Evidence,* Prior conviction, On cross-examination, Photograph, Admissions and confessions. *Jury and Jurors. Witness,* Expert: qualification. *Homicide. Practice, Criminal,* Capital case.

Failure of the defendant in a murder trial to object to the prosecution's eliciting from its witness her plea of guilty to being an accessory to manslaughter, a murder charge against her being nol prossed, until after the defense had exploited her plea and its implications during cross-examination, justified the trial judge in overruling the objection [311-312]; his instructions to the jury after objection was taken and in the final charge eliminated any error even if the objection had been timely made [312-313].

At the trial of a defendant for murder, the judge committed no error in directing defense counsel not to use the word "deal" when referring to a plea of a prosecution witness involved in the homicide to being an accessory to manslaughter. [313]

On cross-examination of a prosecution witness at a murder trial, the judge properly refused to have the whole statement made by the witness to

---

police received as an exhibit, correctly explaining that the document could be and had been used by the defense only as a basis for impeaching the witness through prior inconsistent statements. [313-314]

At a murder trial, there was no error in the judge's refusal to reject for cause three members of the venire [314]; in the admission in evidence of photographs of the victim's body before autopsy and after autopsy [314-315]; in the allowance of the prosecution's objection to a question on cross-examination of a young medical "resident" in the hospital whether he disagreed with the judgment of the pathologist regarding cause of death [315]; or in the reading of the defendant's statement containing admissions from the witness stand by a police officer who was present when the statement was given and who had typed it and signed it as a witness [315].

At the trial of the defendant for the murder in his house of the four-year old child of a woman with whom the defendant was living, evidence that over a period of some weeks the defendant, vexed by the child's ineptitude, pursued a course of slapping and punching him, and one morning punished him by repeated slaps or blows, some to his head, resulting in the child's death, warranted the trial judge's refusal of a directed verdict on the charge of murder in the first degree on which the defendant was convicted [315-316]; however, this court, under G. L. c. 278, § 33E, vacated such verdict and ordered the entry of a verdict of murder in the second degree where a conclusion of deliberate premeditation was difficult to reach and the surest surmise was that the lethal blows were struck in an access of anger and frustration [316-319]; and where the case was not persuasive of "extreme . . . cruelty," and there was no indication of extended suffering by the child from the lethal blows [318]. QUIRICO, J., with whom ABRAMS, J., joined, dissenting.

INDICTMENT found and returned in the Superior Court on April 10, 1975.

The case was tried before *McLaughlin*, C.J.

*Thomas J. O'Connor* for the defendant.

*L. Jeffrey Meehan*, Special Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The jury verdict of guilty in this case must be taken to establish that the defendant Cadwell, living in his house in Pittsfield with Mrs. Judith Gerwaski and her two children, inflicted injuries on the child Walter which caused his death. Walter, aged four, was a frail boy, weighing about twenty-five pounds, a slow learner, not yet fully toilet trained. The jury could believe that the defendant, vexed by

the child's ineptitude, pursued over a period of some weeks a course of slapping and punching him, striking him with a paddle, and abusing him in other ways so that he was bruised over a considerable extent of his body. On the morning of January 26, 1975, the child had trouble swallowing a doughnut. There was evidence that the defendant punished him by repeated slaps or blows, some to his head. Death probably came as the blows ceased or very shortly thereafter. Efforts at resuscitation by the defendant, the police, and staff at the hospital, to which the child was brought, failed of any effect. At an autopsy performed that afternoon, reflexion of the scalp revealed bilateral subdural hematomas. The pathologist concluded that death was caused by "multiple blunt force injuries to the head" (as by blows with the hand) inducing the hematomas.

The defendant was indicted for murder. On trial, the judge denied motions for a directed verdict on the whole case and on so much of the indictment as could be taken to charge murder in the first or second degree. The judge instructed the jury with regard to two types of murder in the first degree (in the words of G. L. c. 265, § 1: "[m]urder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty"), murder in the second degree, and manslaughter, voluntary and involuntary. The jury returned a verdict of murder in the first degree, and from the judgment of conviction thereon the defendant takes his appeal pursuant to G. L. c. 278, §§ 33A-33G.

None of the refusals to direct a verdict is urged as error, so there is no challenge to the verdict for lack of adequate support in the evidence.[1] Errors assigned and argued center on

---

[1] Taking the stand in his own behalf, the defendant said he had affection for the boy and a desire to instruct him, and denied that he disciplined him, either on January 26 or before, as severely as might appear. He suggested that heavier punishments might have come from Mrs. Gerwaski. There was no direct eyewitness testimony to the fatal beating on January 26. Mrs. Gerwaski's testimony appears to be that she heard slapping sounds from time to time over an interval which she estimated at twenty or twenty-five minutes.

the judge's rulings during the appearance on the stand of
Mrs. Gerwaski as a prosecution witness. They also cover a
miscellany of other rulings. These challenges come to little,
as we shall see, but a question remains as to our duty under
G. L. c. 278, § 33E.

1. *Rulings regarding the witness Gerwaski.* Mrs. Ger-
waski had herself been indicted for murder. (On her testi-
mony in the present record it would appear that her fault
lay chiefly in turning the "disciplining" of the boy over to
the defendant and knowingly allowing him to carry on.)
Mrs. Gerwaski testified at length to the defendant's acts. As
her testimony began, the prosecution elicited from her that
she had pleaded guilty to being an accessory to the crime of
manslaughter, the murder charge being nol prossed.[2] The
defense objected that there was danger the jury would infer
from this testimony that the defendant must be guilty of
manslaughter, at least, for there could not be an accessory
without a principal, who must have been the defendant.
The position of the defense presumably was that the Com-
monwealth should have taken Mrs. Gerwaski through a
direct examination without getting into the matter of her
guilty plea; the defense would be then at liberty on cross-
examination to use the plea to weaken her credibility by
suggesting bias as well as conviction of crime. Possibly the
defense was suggesting that neither side should interrogate
on the subject.

The first difficulty with the objection is that it was not
made at the threshold of Mrs. Gerwaski's testimony when
she was led to make her statements about her guilty plea. It
was not until after the defense had exploited the fact of the
plea and its implications during cross-examination in an at-
tempt to discredit the witness, that it got around to raising
the question of the propriety of the prosecution's tactic. The

---

[2] The defense suggests that there is no such accessorial crime, cf. *Com-
monwealth* v. *Hebert*, 373 Mass. 535 (1977), but this is not a matter for
discussion on the present appeal.

remonstrance was late. Cf. *United States* v. *Chamley*, 376 F.2d 57, 60 (7th Cir. 1967).

Had the objection been timely made in the same form, the judge would have been justified in overruling it and permitting the prosecution to question Mrs. Gerwaski as it did. When the prosecution tenders as its witness a person with a criminal record, it sometimes starts by eliciting this history. (The defense sometimes does the same when offering such a witness on its part.) The interrogation should not be regarded as an impeachment of the prosecution's own witness prohibited by G. L. c. 233, § 23[3] (see *Commonwealth* v. *Garrison*, 398 Pa. 47, 52 [1959]; 3A J. Wigmore, Evidence § 900, at 666-667 n.1 [Chadbourn rev. 1970]; cf. *Walter* v. *Bonito*, 367 Mass. 117, 120-122 [1975]), nor can the defense claim a right to bring out the damaging facts for the first time in a perhaps more dramatic way on cross-examination. This "is not something which is to be reserved for the pleasure and strategy of the defense." *United States* v. *Freeman*, 302 F.2d 347, 350 (2d Cir. 1962). The jury are entitled to the information for its bearing on the value of the witness's testimony, and the prosecution might indeed on occasion suffer unfairly in the estimation of the jury for attempting to conceal the criminal record if it did not come forward with it. Instruction by the judge about the exact significance of the testimony is of course advisable.

The situation is more delicate when the prosecution uses a witness who has pleaded or been found guilty for involvement in one way or other in the commission of the crime being tried (see *United States* v. *Mahler*, 363 F.2d 673, 678 [2d Cir. 1966]), for the jury may leap improperly to conclusions

---

[3] Section 23 provides: "The party who produces a witness shall not impeach his credit by evidence of bad character, but may contradict him by other evidence, and may also prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them."

about the guilt of the defendant. Here there is peculiar need for a measured instruction about the inferences that the jury can or cannot legitimately draw from the particular testimony. See *State* v. *Costa,* 11 N.J. 239, 249 (1953). Cf. *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 9 (1973); *Commonwealth* v. *Sousa,* 350 Mass. 591, 595-596 (1966). In the present case the judge did so instruct after objection was taken by the defense, and he instructed further on the point in his final charge to the jury. No criticism is made of the instructions. There are cases where special pains should be taken with the assistance of the parties to formulate such an instruction to the jury, and other cases where the wisest course may be for counsel on both sides to refrain from referring to a conviction. See *United States* v. *Aronson,* 319 F.2d 48, 52 (2d Cir. 1963); *United States* v. *Freeman, supra* at 350.[4] These problems should, where feasible, be discussed with the judge before trial or before the witness is called. At any rate the present claim of error is seen to be unavailing.

The judge committed no error in directing defense counsel not to use the word "deal" when referring to the guilty plea. What actually occurred — the witness's undertaking to testify in the defendant's trial, the recommendation of the assistant district attorney to the court, and so forth — was made clear in less septic language, and the defense was not thereby unduly limited in examining the witness or in commenting on the facts in its closing speech.

On cross-examination of Mrs. Gerwaski, the defense asked to have the whole statement made by her to the police received as an exhibit. The judge refused, with the correct explanation that the document could be and had been used by the defense only to the extent it provided a basis for im-

---

[4] Chief Judge Lumbard said at the cited page of the *Freeman* case: "There may be circumstances where, on proper request of the defense, the trial judge should limit, or even bar such testimony, or allow it only under cautionary instructions because the prejudice to the defendant of the witness' admission of crime implicating the defendant would outweigh the advantages of a full disclosure of the witness' criminal background. Here we find that there was no likelihood of prejudice."

peaching the witness through prior inconsistent statements. See W.B. Leach & P.J. Liacos, Massachusetts Evidence 118 (4th ed. 1967). The same reasoning applied to the use of Mrs. Gerwaski's testimony at the probable cause hearing and before the grand jury. Such inconsistencies as did appear — and they were many — were brought out in the extended cross-examination.

Questions put to Mrs. Gerwaski by the Commonwealth, objected to as going beyond the proper bounds of redirect examination, were proper because responsive to the cross-examination. The judge indeed has discretion to allow a redirect that ranges further. See *Commonwealth* v. *St. Pierre,* 362 Mass. 886 (1972); McCormick, Evidence § 32 (2d ed. 1972).

2. *Other rulings.* (a) Complaint is made of the judge's refusal to reject for cause two members of the venire who may be taken to have had a feeling or formed some opinion about the case but who said they felt they could hear it impartially. It is contended also that the judge should have excluded a venireman who said he knew the assistant district attorney favorably. The judge has a latitude in sizing up veniremen for service on the jury and there is no sound basis for overriding his judgment here. See *Commonwealth* v. *Dickerson,* 372 Mass. 783, 794 (1977); *Commonwealth* v. *Geagan,* 339 Mass. 487, 505-506 (1959).

(b) Photographs of the boy's body before autopsy were admitted in evidence near the beginning of the trial and photographs after autopsy were first marked for identification and later admitted in evidence in connection with the testimony of the pathologist who gave an opinion (virtually unchallenged) as to the cause of death. These exhibits were relevant to issues in the case including cause of death and atrocity or cruelty, and we cannot conclude that the judge erred in considering that their probative value overcame any tendency they might have to stir irrationality in the triers. See *Commonwealth* v. *Bys,* 370 Mass. 350, 357-361 (1976); *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 817 (1973). In fact the defense withdrew its objection to the in-

troduction of the autopsy pictures. The precise order of admission of the exhibits was a matter for the judge which he did not mishandle. We should note that due attention was paid to trying to distinguish the bruises that might have been caused by the attempts to revive the child, from those inflicted previously.

(c) A young medical "resident" serving in the emergency room of the hospital to which the child was taken testified to the procedures used in the attempt at resuscitation there. He was asked on cross-examination whether he disagreed with the judgment of the pathologist regarding cause of death. The defense complains of the judge's allowing the prosecution's objection to the question, but it was evident from the witness' own testimony that he lacked the experience in pathology which could have given any measure of credit to his answer. See *Commonwealth v. Seit,* 373 Mass. 83, 91-92 (1977).

(d) The defendant's statement containing admissions was read from the witness stand by a police officer who was present when the statement was given and who had typed it and signed it as a witness. The reading was objected to solely on the ground that the officer might distort the statement by inflections of his voice, but there is no indication that he did.

(e) The defense criticizes the judge's instructions to the jury on the subjects of the significance of a finding of probable cause and the making of permissible inferences from the evidence. There is criticism, too, of the judge's supposedly giving an emphasis to certain parts of his instructions about malice aforethought and deliberate premeditation which is said to have weighed unfairly against the defendant. The points urged have been examined and are without merit.

3. *Consideration of § 33E.* Carrying out our duty under G. L. c. 278, § 33E, to examine "the whole case" on the "law and evidence" to determine whether "for any . . . reason that justice may require" the court ought to "direct

the entry of a verdict of a lesser degree of guilt," [5] we have read the record with much care and attention to detail. For background we have consulted, and found of interest, published studies analyzing the "battered child syndrome," a phenomenon recognized in *Commonwealth* v. *Cutler,* 356 Mass. 245, 247, 248 (1969) (manslaughter conviction for abuse of child resulting in death).[6] We consider the crime to be very serious and not less so because committed by one in a relation of parent to the victim. We do not disagree with the trial judge's refusal of a directed verdict on the charge of murder in the first degree; as noted, the defense does not argue that the ruling was incorrect. But under § 33E it is appropriate for the court to consider whether the verdict was "against the weight of the evidence considered in a large or nontechnical sense." *Commonwealth* v. *Bowman,* 373 Mass. 760, 765 (1977), citing *Commonwealth* v. *McInerney,* 373 Mass. 136, 140 (1977), and *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963). Here we conceive there is no question of reducing the verdict below murder; the question that presents itself is the less drastic one whether there is ground for reducing from first to second degree murder.

We think there is such ground. Deliberate premeditation in the sense of the statute can perhaps be pieced out of the evidence, but that conclusion is much harder to reach on the proofs here than in the run of convictions involving that ele-

---

[5] Section 33E, as amended through St. 1974, c. 457, provides in part: "In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence."

[6] See Steele & Pollock, Psychiatric Study of Parents Who Abuse Infants and Small Children, in R. Helfer & C. Kempe, eds., The Battered Child (2d ed. 1974). Note the discussion and references to the literature in *People* v. *Steger,* 16 Cal. 3d 539 (1976); *Landeros* v. *Flood,* 17 Cal. 3d 399 (1976).

ment. On the whole record, the surest surmise is that the lethal blows were struck by the defendant in an access of anger and frustration. There is an irreducible doubt in all the circumstances whether the defendant consciously formed a purpose that morning to do the child mortal injury; but if the defendant did, it is still probable that the resolve lasted for only "a fleeting period of time," as we said of the interval of premeditation in *Commonwealth* v. *Williams*, 364 Mass. 145, 152 (1973), where we applied § 33E to reduce a murder verdict to the second degree.

We find instructive the court's remarks in *People* v. *Steger*, 16 Cal. 3d 539 (1976) (4-3). That was a case of aggravated child abuse resulting in death. Under the California statute a homicide by "torture" must have been premeditated in order to be punishable as murder in the first degree. The court thought premeditation was lacking but, finding that the record amply supported a second degree conviction, it exercised a power to reduce the conviction from first to second degree. (In the present case we need not go so far as to negate all premeditation in order to apply § 33E.) The court said through Mosk, J.: "The beatings were a misguided, irrational and totally unjustifiable attempt at discipline; but they were not in a criminal sense wilful, deliberate, or premeditated." *Id.* at 548. "While obviously it is impossible to typify all child-battering parents, one survey of the studies in the field concludes: 'the abuser tends to suffer from emotional pressures which are not directly related to the child himself, focuses his own general feelings of frustration and anger on the one child,[7] and expresses his emotions through an immature and *uncontrolled* display of physical abuse of the child.' (Italics added.) (Note, *The Battered Child: Logic in Search of Law* (1971) 8 San Diego L. Rev. 364, 375.) The description seems applicable to the . . . defendant: her *uncontrolled* outbursts of frustration appear inconsistent with a theory of deliber-

---

[7] In our case there was a sibling female child, a mongoloid, who evidently was not abused.

ate torture murder." *Id.* at 549 n.4. (The California court went on to say that it did not exclude the possibility on exacerbated facts of a proper first degree conviction.) See also *Pannill* v. *Commonwealth,* 185 Va. 244 (1946).

Turning in our case from the premeditation basis for a first degree conviction to the alternative basis of "extreme atrocity or cruelty," which, under our past decisions, does not involve premeditation (see *Commonwealth* v. *Appleby,* 358 Mass. 407, 415 [1970]), again a jury might piece a guilty verdict out of the testimony. But we note that although the episode of January 26 was one of a number of punishments of the child, the previous assaults were physically distinct from the final assault; they were not themselves an accumulative cause of death. This was the pathologist's specific finding. The hematomas probably resulted from impact of the palm of the defendant's hand, and there is no indication of extended suffering. Applying to the facts the four considerations that our decisions have held particularly relevant, we can say, at least, that we have here a case much less persuasive of extreme cruelty than is commonly found in convictions on that basis. Our characteristic statement of these considerations reads thus (from *Commonwealth* v. *Satterfield,* 362 Mass. 78, 81-82 [1972], which quotes from *Commonwealth* v. *Connolly,* 356 Mass. 617, 628 [1970]): "Our cases have usually looked to the consciousness and degree of suffering of the victim, the disproportion between the means actually needed to inflict death and those employed, the instrumentalities employed and the extent of physical injury."

We conclude that "the thrust of the evidence" (*Commonwealth* v. *Jones,* 366 Mass. 805, 808 [1975]) is toward a verdict of murder in the second degree rather than the ultimate verdict that the jury brought in. As was said in *Commonwealth* v. *Williams, supra* at 152, the defendant's "criminal involvement was not of the nature that judges and juries, in weighing evidence, ordinarily equate with murder in the first degree."

The crime was abhorrent. But it is in just such cases that we must be on guard against too passional a reaction, which in the long run will not promote due enforcement of the criminal law.[8]

The case is remanded to the Superior Court where the verdict and sentence are to be vacated; a verdict of guilty of murder in the second degree is to be entered and sentence imposed thereon.

*So ordered.*


QUIRICO, J. (with whom Abrams, J., joins, concurring in part and dissenting in part). I concur with the opinion of the court through the end of part 2. However, I dissent from the conclusion in part 3 and from the resulting order that the verdict of guilty of murder in the first degree be reduced to guilty of murder in the second degree. The evidence discloses that the defendant, whatever his motivation, physically abused and beat the helpless, frail, twenty-five pound, four year old victim to the point where the child was bruised over a considerable extent of his body. This course of conduct culminated in the defendant's lethal beating of the victim on January 26, 1975.

The instructions which the judge gave to the jury permitted them to find the defendant had committed the crime of murder in the first degree by reason of "extreme atrocity or cruelty." G. L. c. 265, § 1. "Our cases have usually looked to the consciousness and degree of suffering of the victim, the disproportion between the means actually

---

[8] It is a deeply regrettable circumstance that although some five social or welfare agencies were dealing with the Gerwaski family, there is no indication on this record that any observer perceived the likelihood of child abuse, and so none was prompted to report it under G. L. c. 119, § 51A. See *Landeros* v. *Flood,* 17 Cal. 3d 399 (1976), for the possible tort aspects of a failure to report (or, in the case of an attending physician, of negligent failure to recognize the syndrome and take proper corrective action).

needed to inflict death and those employed, the instrumentalities employed and the extent of physical injury. The final determination of whether extreme atrocity or cruelty exists, however, must be decided by the jury, who, as the repository of the community's conscience, can best determine when the mode of inflicting death is so shocking as to amount to extreme atrocity or cruelty." *Commonwealth* v. *Connolly*, 356 Mass. 617, 628 (1970). The jury were correctly instructed on the law and the evidence was sufficient to support their verdict that the defendant was guilty of murder in the first degree.

General Laws c. 278, § 33E, provides that in a case where a defendant has been indicted for murder in the first degree and convicted of murder either in the first or second degree, this court "may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence." In the circumstances of this case, I would not exercise our power under the statute to grant the defendant any relief from his conviction of murder in the first degree.