COMMONWEALTH vs. ELIZABETH HUTCHINSON.

Middlesex. February 5, 1985. — August 5, 1985.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Jury and Jurors. Practice, Criminal*, Challenge to jurors, Capital case, Instructions to jury, Presumptions and burden of proof, Conduct of counsel. *Constitutional Law*, Jury. *Due Process of Law*, Presumptions and burden of proof.

The judge at the murder trial of a female defendant properly followed the procedure described in *Commonwealth* v. *Soares*, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979), in ruling on the Commonwealth's contention, made during empanelment of the jury, that the defendant had misused her peremptory challenges for the systematic exclusion of women from the jury, where the judge permissibly found, after hearing counsel, that a pattern of excluding women had been established and where he then, after affording counsel the opportunity for further hearing, seated three female prospective jurors whom the defendant had sought to challenge peremptorily. [570-572]

A criminal defendant whose misuse of peremptory challenges during empanelment of a jury had been successfully objected to by the Commonwealth was not entitled to the dismissal of jurors selected up to that point in the empanelment and to the selection of an entirely new jury from a different venire. [572-573]

At the trial of an adult female defendant charged with murder in the death of a child not quite four years old, the evidence warranted the judge's denial of the defendant's motion for a required finding of not guilty on so much of the indictment as charged murder in the first degree, of which the defendant was later convicted. [573]

On appeal by an adult female defendant convicted of murder in the first degree in the death of a child not quite four years old, this court, after reviewing the entire record pursuant to G. L. c. 278, § 33E, concluded that the verdict was neither against the law nor the weight of the evidence and that the interests of justice did not require the entry of a verdict of a lesser degree of guilt. [573-578]

At the trial of an adult defendant charged with murder in the death of a child not quite four years old, the judge's instruction to the jury, to which no objection was made, that, "[i]f you find that the injury to the child that resulted in the subsequent death was accidental . . . [y]ou

would make a finding of not guilty on the murder indictment," did not, in the circumstances, either relieve the Commonwealth of its burden of proving that the victim's death was not accidental nor shift to the defendant the burden of proving her contention that the victim's death resulted from an accidental fall. [578-579]

At the trial of an adult female defendant for murder in the death of a child not quite four years old, the judge did not err in instructing the jury that "malice may be implied from a blow with the fist to a small child." [579]

At the trial of a capital case, certain behavior of counsel, characterized on appeal as "bickering," presented no occasion for relief under the power granted this court by G. L. c. 278, § 33E. [580]

INDICTMENT found and returned in the Superior Court Department on December 21, 1982.

The case was tried before *James J. Nixon,* J.

*Steven J. Rappaport* for the defendant.

*Pamela L. Hunt,* Assistant District Attorney (*Ellis M. Enlow,* Assistant District Attorney, with her) for the Commonwealth.

O'CONNOR, J. The defendant was convicted of the murder in the first degree of Brandy Blair Mallett, a child almost four years old, and was sentenced to life in prison. The Commonwealth contended at trial that the defendant beat Brandy to death. The defendant claimed that Brandy died from accidentally falling down a flight of stairs. The defendant's appeal was entered directly in this court.[1]

The defendant argues that the trial judge impermissibly seated three jurors whom the defendant had peremptorily challenged. Secondly, the defendant asserts that the judge erred in denying her motion for a required finding of not guilty of murder in the first degree. Her argument in support of that assertion, however, does not really focus on the legal sufficiency of the evidence to warrant the finding of murder in the first degree. Rather, it focuses on why this court should exercise its power under G. L. c. 278, § 33E (1984 ed.), to reduce the verdict to murder in the second degree. Finally, the defendant argues that, in light of certain deficiencies in the judge's instruc-

---

[1] Counsel for the defendant on appeal did not represent the defendant at trial.

tions to the jury, and in light of improper conduct of both counsel throughout the trial, we should exercise our power under G. L. c. 278, § 33E, to order either a new trial or the entry of a verdict of manslaughter. We reject the defendant's arguments, and we affirm the judgment below.

1. *Empanelment of the jury.* Sixteen jurors were empanelled. In empanelling the jury, the judge examined each prospective juror individually for possible bias, and he immediately declared whether or not he found that juror to be indifferent. If he found a juror not to be indifferent, the juror was excused. If he found a juror to be indifferent, the juror was then immediately subject to peremptory challenge by the parties. If neither party challenged a juror, the juror was seated.

After twelve jurors had been seated, the defendant peremptorily challenged a woman. The prosecutor informed the judge at the side bar that the defendant had exercised fourteen peremptory challenges and that thirteen of the persons challenged (the correct number was twelve) were women. Citing *Commonwealth* v. *Soares*, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979), the prosecutor asked the judge to seat the juror despite the defendant's peremptory challenge. After hearing both counsel, the judge found that "there has been a pattern of exclusion of females from the jury, females that otherwise appear to the Court to be indifferent and competent to sit without prejudice or bias and would be impartial jurors." The judge seated the juror, and the selection process continued. The judge excused the next prospective juror, and the defendant peremptorily challenged the juror after that, another woman. Again relying on *Commonwealth* v. *Soares, supra,* the prosecutor moved that the juror be seated, and, after hearing both counsel, the judge seated the juror. The Commonwealth challenged the next two prospective jurors, a male juror was seated, and then the defendant peremptorily challenged another woman. After a hearing, the judge again allowed a motion by the prosecutor to seat the juror.

The defendant argues that the judge failed to follow the guidelines set forth in *Commonwealth* v. *Soares, supra,* for identifying impermissible peremptory challenges, and that, as a result, she was denied her right to a trial before an impartial jury guaran-

teed by the Federal and State Constitutions. Those assertions are without merit. First of all, as we shall see, the record does not demonstrate that the judge failed to follow the guidelines announced in *Soares*. Secondly, even if the judge had failed to follow those guidelines, that would not of itself result in a denial of the defendant's right to a trial before an impartial jury. Neither the Federal nor the State Constitution guarantees a criminal defendant the right to exercise peremptory challenges. *Commonwealth* v. *Reid*, 384 Mass. 247, 253-254 (1981).

In *Soares, supra* at 489 n.35, we recognized that a criminal defendant's right of peremptory challenge, as important as it surely is, is nevertheless limited by the Commonwealth's right to insist on a jury that fairly represents the community. There is a "presumption of proper use of peremptory challenges. That presumption is rebuttable, however, by either party on a showing that (1) a pattern of conduct has developed whereby several prospective jurors who have been challenged peremptorily are members of a discrete group, and (2) there is a likelihood they are being excluded from the jury solely by reason of their group membership." *Id*. at 489-490. Here, when the Commonwealth presented it first *Soares* motion, the jury consisted of four women and eight men (a fifth woman had been seated and then excused), the defendant had peremptorily challenged twelve women and only two men, the defendant's last eleven peremptory challenges had been exercised against women, and the defendant had challenged the last three women declared indifferent by the judge. The judge found that a pattern of excluding women had been established, thus rebutting the presumption of proper use of peremptory challenges. The facts recited above warranted that conclusion.

The judge having determined that the presumption of the proper use of the defendant's peremptory challenges had been rebutted, the burden shifted to the defendant to demonstrate that the peremptory challenges objected to by the Commonwealth were not based solely on the sex of the jurors. *Soares, supra* at 491. The defendant claims that she was not given an opportunity to sustain her burden, but the record does not support her claim. After the Commonwealth presented its first *Soares* motion, the judge and counsel for both sides fully discussed the motion, the Commonwealth's reason for advancing it, and the defendant's

contentions in opposition to it. The defendant took the position that no pattern of exclusion had been established, and that all of her peremptory challenges were "based on the questions and the responses on voir dire, and for no other reason." Counsel gave no specifics. When the Commonwealth made its second *Soares* motion, the judge inquired as to the reasons for the defendant's peremptory challenge, and defense counsel responded: "It has nothing to do with the fact that she is a female alone. It has to do with the defendant's right to exercise her peremptory challenge in a fashion that would provide for a jury which she feels accurately reflects a cross-section of the community." Counsel provided no more detailed explanation. The judge also invited defense counsel to explain his peremptory challenge which gave rise to the Commonwealth's third *Soares* motion, but defense counsel declined to offer any explanation. We conclude that the judge followed the procedure set out in *Soares* for determining whether the defendant's peremptory challenges were proper, and that the evidence warranted the judge's determination in that regard.

The defendant argues that, even if the judge correctly determined that she improperly exercised her peremptory challenges, the judge acted impermissibly by seating the three challenged jurors. Relying on *Soares, supra* at 491, she asserts that the only appropriate remedy was dismissing the jurors already selected, quashing the remaining venire, and starting anew. In *Soares*, the Commonwealth's impermissible challenges resulted in a denial of the defendants' right to be tried by a jury fairly representative of the community. Therefore, we concluded that the appropriate remedy for that wrong included dismissal of the jurors thus far selected and the quashing of the remaining venire "since the *complaining party* is entitled to a random draw from an entire venire — not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges" (emphasis added). *Id.* at 491. But here, the complaining party is the Commonwealth, not the defendant. Nothing in *Soares* suggests that a defendant, whose misuse of peremptory challenges proves unsuccessful, is entitled to select a new jury from a

new venire. In *Commonwealth* v. *Reid*, 384 Mass. 247, 255 (1981), we rejected the precise argument made here, stating that "[s]uch a limitation on the trial judge's ability to respond in these circumstances would place in the hands of litigants the unchecked power to have a mistrial declared based on their own misconduct. It would be a reproach to the administration of justice were we to sanction such a result."

2. *Motion for a required finding of not guilty of murder in the first degree.* As we stated early in this opinion, the gravamen of the defendant's argument is not that the evidence was legally insufficient to warrant a conviction of murder in the first degree. As the evidence we recite below demonstrates, that argument would be without merit. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). Instead, the defendant asks us to conclude, as did the majority of the court in *Commonwealth* v. *Cadwell*, 374 Mass. 308 (1978), that her "criminal involvement was not of the nature that judges and juries, in weighing evidence, ordinarily equate with murder in the first degree." *Id.* at 318, quoting *Commonwealth* v. *Williams*, 364 Mass. 145, 152 (1973). The defendant requests that, on the basis of that conclusion, we order the entry of a verdict of murder in the second degree. We may do so only "if satisfied that the verdict was against the law or the weight of the evidence . . . or for any other reason that justice may require." G. L. c. 278, § 33E. We are not satisfied that the verdict was against the law or the weight of the evidence, or that justice requires a reduction of the verdict.

We summarize the relevant evidence. In late 1981, the defendant moved into 247 Russell Street, Everett, with Roy Mallett, Jr. (Mallett), his wife Lucinda, and their three children: Ray, then six years old; Brandy, nearly three; and Kimberly, nearly one. Shortly after the defendant's arrival, Lucinda left, leaving the defendant to care for the children while their father was at work. In the months following the defendant's arrival, neighbors sharing common walls with 247 Russell Street began to hear banging and slapping noises emanating from that address during the day when Mallett was out of the house at work. Neighbors heard all three children crying, as if in pain,

but they heard Brandy crying the most. The defendant hit all the children, but she hit Brandy the most. The defendant struck Brandy with her hands and with a belt.

As the summer of 1982 approached, the children rarely left the house, and, when they did, they always wore long pants and long sleeved shirts. In July, 1982, after the defendant had taken an overdose of Librium, she and Mallett met with Patricia Powers, a registered nurse and director of the emergency psychiatric team at the Tri-City Mental Health Center in Malden. After the meeting, Powers saw Brandy, and she observed "inflicted" injuries on the side of Brandy's face. The injures "had the clear outline of a hand." After seeing Brandy, Powers filed a report with the Department of Social Services, pursuant to G. L. c. 119, § 51A (1984 ed.), indicating her suspicion of child abuse or neglect. In August, 1982, a neighbor, Linda Isbart, observed "a black-and-blue mark in the shape of a handprint" covering the side of Brandy's face. On October 9, 1982, another neighbor, Sheila Howard, observed "an unusually big bruise over [Brandy's] left eye." The defendant told her that Brandy had fallen down the stairs. On another occasion, the defendant gave that explanation to Brandy's uncle in order to explain another injury to Brandy.

On October 14, between 3 P.M. and 4 P.M., Linda Isbart heard some "very, very hard" banging on the wall of 247 Russell Street. The banging continued for a few minutes. At the same time that Linda Isbart heard the banging, she heard Brandy crying, and saying, "Please, mama, don't hit me. I promise I will be a good girl for you." Linda Isbart heard the defendant respond: "If you don't shut . . . up, by the end of this . . . day I will . . . kill you. Do you hear me? I'll . . . kill you." The following morning Linda Isbart reported the incident to the Department of Social Services.

On October 15, at about 4 P.M., Maureen O'Leary, a neighbor, heard a "strange banging noise" emanating from 247 Russell Street. The banging continued for about forty-five minutes. She heard the defendant ask, "Do you want it again?" and she Brandy whimpering incoherently.

On October 16, at about 9 A.M., Kelly Ann O'Leary heard screaming and banging on the common wall. At the same time, she heard Brandy crying. The banging lasted about ten minutes. Later between 1 P.M. and 2 P.M., Charles Isbart heard banging coming from 247 Russell Street, "[l]ike somebody hitting a wall." At the same time, he heard Brandy crying. After five minutes, Isbart heard "two loud thumps," and, after that, no more crying.

Six year old Ray Mallett was home with the defendant and Brandy on October 16. During the day, he saw the defendant hitting Brandy, pulling Brandy by the hair, and throwing her to the ground. At one point, Ray went to the cellar, and, while there, he heard a lot of banging, and he heard Brandy's crying. Ray then heard one big bang, and the crying stopped. Ray heard the defendant say, "Brandy, get up. Wake up," and when Ray came upstairs he saw the defendant holding Brandy in her hands. Brandy looked "asleep." The defendant told Ray that Brandy had fallen down the stairs.

Roy Mallett arrived at work just before 8 A.M. on October 14, 15, and 16, and left at 5 P.M. Mallett's employer did not see him leave the work premises during those hours on any of those days. Mallett was not at home during the day on October 16.

At about 3 P.M. on October 16, in response to instructions from headquarters, Everett Police Officer John J. Fahey went to 247 Russell Street to investigate a report of a child having fallen down a flight of stairs. When he saw Brandy, Officer Fahey immediately asked the defendant for a blanket and took Brandy to Whidden Memorial Hospital in Everett. Officer Fahey testified that the defendant was not crying and "didn't seem to be that concerned." Pursuant to G.L. c. 119, § 51A, Officer Fahey filed with the Department of Social Services a report indicating his suspicion of child abuse or neglect.

Dr. Patsy Cipolloni examined Brandy in the emergency room. He observed that Brandy was deeply comatose, that her body was covered with multiple bruises, and that her right leg was twisted and obviously fractured. He testified that the bruises were consistent with a beating with bare hands by an adult over a period of time, or with someone beating Brandy's head against a wall, but not with a fall down a flight of stairs.

Dr. Cipolloni formed the opinion that Brandy's injuries resulted from child abuse.

Brandy was transferred from Whidden Memorial Hospital to Massachusetts General Hospital, where she was examined by Dr. Peter Black. Dr. Black testified that Brandy was "disastrously injured," and that she had bruises over "almost every part of her body." A CAT scan indicated "massive swelling" within Brandy's brain. In addition, Brandy's right femur (thigh bone) was fractured. Dr. Black immediately prepared Brandy for surgery. When her head was shaved, Dr. Black observed bruises over Brandy's entire scalp. Before operating, he took a few photographs of Brandy "[b]ecause she looked so awful." He had only taken photographs of a patient's injuries once before. Dr. Black thought that the head injuries resulted from Brandy's head having been shaken or from multiple blows. He thought it "unlikely" that the resulted from a fall down stairs. He also testified that the injuries could have resulted from Brandy's having had her head beaten numerous times against a hard flat surface, like a wall.

On October 29, Brandy was declared dead. Dr. Leonard Atkins, an associate Suffolk County medical examiner who performed the autopsy on Brandy's body, determined the cause of death to be "[s]ubdural hematoma [blood clotting] as a consequence of blunt-force head trauma." He testified that Brandy's injuries were inconsistent with a fall down stairs.

Dr. Eli Newberger, director of the family development clinic at Children's Hospital Medical Center in Boston and an expert on child abuse, testified at the trial that, in his opinion, Brandy's injuries resulted from multiple blunt-force trauma such as "where a child's head may have been struck against a hard surface repeatedly, [or] where a child's head may have been struck by a fist or by another implement many times." He said that there was a "zero likelihood" that the injuries resulted from a fall down the stairs. On a scale of one to ten, with a ten representing the most serious cases of child abuse that he had seen, Dr. Newberger said that "this is a case which, without question, would merit a 10. It is one of the most serious cases."

Among other witnesses, the defendant called Dr. William Q. Sturner, chief medical examiner in Rhode Island, to testify.

On direct examination, Dr. Sturner testified that, in his opinion, Brandy's injuries were consistent with a fall down a flight of stairs. On cross-examination, however, Dr. Sturner conceded that "neither the leg nor the head injury would be consistent with an accidental fall by [Brandy] down any stairs."

A former inmate at the Massachusetts Correctional Institution at Framingham testified that she had had a number of conversations with the defendant while the defendant was awaiting trial. The witness testified that the defendant said that she had lost her temper many times and hit the children, that her blows left many marks and bruises, and that, on October 16, the defendant hit Brandy many times before Brandy fell down the stairs.

The defendant testified about her troubled childhood, about her health problems, and about certain unfortunate aspects of her situation in the Mallett household. The jury also heard testimony about the "battered child syndrome," see *Commonwealth* v. *Cadwell,* 374 Mass. 308, 316 (1978), and about the defendant's apparent inability to cope with the responsibilities of raising young children.

Although this case resembles *Commonwealth* v. *Cadwell, supra,* there are significant differences between them. We cannot say here, as we did there, that justice requires a reduction of the verdict. Brandy Mallett, unlike the child in the *Cadwell* case, suffered a fractured femur in addition to head injuries of such severity as to be consistent with her head repeatedly having been beaten against a wall. Furthermore, the *Cadwell* case was tried before we held in *Commonwealth* v. *Gould,* 380 Mass. 672, 680-686 (1980), that a jury may consider a defendant's mental impairment on the issues of deliberate premeditation and extreme atrocity or cruelty. There is no reason to believe, therefore, that the jury in the *Cadwell* case considered that factor in deciding whether to find Cadwell guilty of murder in the first degree. The present case was tried after *Gould,* however, and the judge instructed the jury that, in order to find that the defendant killed Brandy with deliberate premeditation, they must find beyond a reasonable doubt that no mental impairment prevented the defendant from deliberately premeditating. The judge also instructed the jury that they could

consider any mental impairment of the defendant in determining whether she murdered Brandy with extreme atrocity or cruelty. Presumably, then, the defendant, unlike the defendant in the *Cadwell* case, received the benefit of the jury's consideration of any impairment of the defendant's mind which may typify adults that batter children. In the circumstances, justice does not require us to overrule the jury's determination, and we decline to do so.

3. *Jury instructions.* The defendant did not object at trial to the jury instructions. Therefore we review the instructions under G. L. c. 278, § 33E, only to determine whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Palmariello,* 392 Mass. 126, 145 (1984).

The defendant contended at trial that Brandy died as a result of an accidental fall down stairs. She focuses now on the judge's instruction to the jury that "[i]f you find that the injury to the child that resulted in the subsequent death was accidental, you need go no further in your deliberations. You would make a finding of not guilty on the murder indictment." The defendant argues that the instruction deprived her of due process because it "was devoid of any significant impact in bringing [the accident] defense to the jury's attention," because it relieved the Commonwealth of the burden to disprove that Brandy's death was accidental, and because it shifted to the defendant the burden of proof on the question of accident.

The defendant's arguments are not persuasive. The defendant was not entitled to special emphasis of her "defense" of accident. This case is not like *Commonwealth* v. *Zezima,* 387 Mass. 748 (1982), in which the defendant admitted shooting the victim, but contended that the shooting was accidental. In that case, we treated the defendant's claim as though it were an affirmative defense, like self-defense, and we concluded that the defendant was entitled to a jury instruction that the Commonwealth had the burden of proving beyond a reasonable doubt that the shooting was not accidental. *Id.* at 756-757. See *Commonwealth* v. *Lowe,* 391 Mass. 97, 110-111, cert. denied, 469 U.S. 840 (1984). Here, however, the defendant does not admit that she caused Brandy's death. She does not defend on

the ground that her action was accidental. Her defense is in no sense an affirmative defense. The defendant simply denied that she killed Brandy, and her assertion that Brandy died as a result of falling down stairs only supports that denial by explaining Brandy's injuries.

Before instructing the jury that they should find the defendant not guilty if they found that Brandy's death was accidental, the judge unequivocally instructed the jury that murder requires an intent to kill or injure another without legal justification, or an intent to perform an act creating a plain and strong likelihood that death will follow. He repeatedly told the jury that the Commonwealth had the burden of proving beyond a reasonable doubt that the defendant possessed the state of mind required for murder. Considering the charge as a whole, we conclude that the specific instruction to which the defendant calls our attention did not relieve the Commonwealth of its burden to prove that Brandy's death was not accidental, nor did it shift to the defendant the burden to prove that Brandy's death resulted from an accidental fall.

The defendant's final argument with respect to the judge's charge is that the judge relieved the Commonwealth of its burden of proving malice beyond a reasonable doubt by instructing the jury that "malice may be implied from a blow with the fist to a small child." In *Commonwealth* v. *Fratus,* 385 Mass. 551 (1982), we refused to reduce a verdict of murder in the second degree against a defendant who struck a five and one-half month old infant "hard" on the side of the head. We concluded that a "jury could find that according to common experience there was a plain and strong likelihood that death would follow the defendant's blow, and could infer that he foresaw serious injury." *Id.* at 554, quoting *Commonwealth* v. *Starling,* 382 Mass. 423, 426 (1981). We came to a similar conclusion with respect to a blow or blows to a two year old child in *Commonwealth* v. *Kane,* 388 Mass. 128, 133-134 (1983), and to a twenty-two month old child in *Commonwealth* v. *Starling, supra* at 425-426. We think that the same conclusion is warranted with respect to a child, such as Brandy, not yet four years old.

4. *Behavior of counsel.* The defendant's final argument is that we should order a new trial under the power granted us by G. L. c. 278, § 33E, because the defendant was deprived of a fair trial by the "endless bickering between counsel . . . and . . . an apparent inability of the trial justice to have the conduct of counsel comport with the standards established by the Code of Professional Responsibility." See S.J.C. Rule 3:07, DR 7-106 (C), as appearing in 382 Mass. 787 (1981); S.J.C. Rule 3:09, Canon 3 (A), (B), as appearing in 382 Mass. 809 (1981). Based on our review of the record, we conclude that the conduct of counsel did not deprive the defendant of a fair trial. Most of the so-called "bickering" appears to have occurred outside the hearing of the jury. Furthermore, we note, as we have noted before, that "we would establish a potentially mischievous precedent if we were to honor the [defendant's] argument [about defense counsel's conduct]. . . . [W]e should hesitate, in this or most cases, to grant relief on the ground that wilfully irksome defense tactics may have harmed the defendant." *Commonwealth* v. *Williams,* 364 Mass. 145, 151 (1973). See note 1, *supra.*

5. *Conclusion.* Having reviewed the entire record as required by G. L. c. 278, § 33E, we decline to order a new trial or to direct the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*