# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Brandon Sherrod,**
**Petitioner Below, Petitioner**

**FILED**

**February 22, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)** **No. 17-0726** (Kanawha County 13-P-415)

**Donnie Ames, Superintendent,**
**Mt. Olive Correctional Complex,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Brandon Sherrod, pro se, appeals the July 31, 2017, order of the Circuit Court of Kanawha County denying his petition for a writ of habeas corpus. Respondent Donnie Ames, Superintendent, Mount Olive Correctional Complex[1], by counsel Benjamin F. Yancey, III, filed a response in support of the circuit court's order. Petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

This case arises out of the shooting death of James Williams, ("the victim"). The victim was shot through his kitchen window. Trial testimony showed that petitioner and his co-defendant were driven to the home where the victim was located, and the two then stood outside the kitchen window. When the victim entered the kitchen, petitioner and his co-defendant shot through the window. The co-defendant testified that he was only attempting to scare the victim, but that petitioner was deliberately aiming at the victim. The driver of the vehicle testified that, after petitioner and his co-defendant returned, petitioner noted that he had shot the victim and later

---

[1] Since the filing of the appeal in this case, the superintendent at Mount Olive Correctional Complex has changed and the superintendent is now Donnie Ames. The Court has made the necessary substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure. Additionally, effective July 1, 2018, the positions formerly designated as "wardens" are now designated "superintendents." *See* W.Va. Code § 15A-5-3.

1

laughed about it. The jury returned a verdict finding petitioner guilty of first-degree murder with a recommendation of mercy. Accordingly, the circuit court sentenced petitioner to a life term of incarceration with the possibility of parole.

In *State v. Sherrod* ("*Sherrod I*"), No. 11-1121, 2012 WL 5857302, at *1-2 (W.Va. November 19, 2012) (memorandum decision), petitioner appealed from his conviction, alleging that insufficient evidence existed to establish the element of premeditation to commit murder and that the circuit court erred in refusing to grant a mistrial following the improper testimony of a witness.[2] This Court rejected the assignments of error and affirmed petitioner's conviction. *Id.* In rejecting petitioner's insufficiency of the evidence argument, the Court determined that a rational trier of fact could have reasonably found that (1) petitioner's friend put a "hit" on the victim; (2) petitioner brought a gun to the scene; (3) petitioner later noted that he had shot the victim and laughed about it; and, therefore, (4) petitioner planned the murder. *Id.*

In 2013, petitioner filed two petitions for a writ of habeas corpus which the circuit court dismissed by separate orders entered August 23, 2013, and February 5, 2014. In *Sherrod v. Ballard* ("*Sherrod II*"), Nos. 13-1141 and 14-0232, 2014 WL 4662484, at *4 (W.Va. September 19, 2014) (memorandum decision), this Court affirmed the dismissal of the first habeas petition, but reversed the dismissal of the second petition. The Court remanded petitioner's case to the circuit court for appointment of counsel and a hearing on his claim of ineffective assistance of counsel. *Id.* Accordingly, the circuit court appointed an attorney to represent petitioner, who filed an amended habeas petition on petitioner's behalf. At a May 18, 2017, evidentiary hearing, petitioner presented the testimony of his trial attorney and an expert regarding ineffective assistance of counsel. On July 31, 2017, the circuit court entered a comprehensive order denying petitioner's amended petition.

Petitioner now appeals the circuit court's July 31, 2017, order denying habeas relief. We apply the following standard of review in habeas appeals:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, of *Anstey v. Ballard*, 237 W.Va. 411, 787 S.E.2d 864 (2016).

---

[2]The witness was asked whether petitioner looked the same as he had at the time of the shooting and answered that "petitioner actually looked healthier [since] his incarceration." *Id.* at *2.

On appeal, petitioner asks this Court to address two claims "that were not raised in the circuit court."[3] Respondent counters that we should decline to address those claims. We agree with respondent. Though petitioner argues that this Court has original jurisdiction to hear habeas claims, we note that this case arises under our appellate jurisdiction. Therefore, we decline to address issues not raised below because "[t]his Court will not pass on a non[-]jurisdictional question which has not been decided by the trial court in the first instance." *Watts v. Ballard*, 238 W.Va. 730, 735 n.7, 798 S.E.2d 856, 861 n.7 (2017) (quoting Syl. Pt. 2, *Sands v. Sec. Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958)).

Having reviewed the July 31, 2017, "Findings of Fact, Conclusions of Law[,] and Final Order," we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to all of the remaining assignments of error raised in this appeal. Therefore, we conclude that the circuit court did not abuse its discretion in denying petitioner's habeas petition. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED**:   February 22, 2019

**CONCURRED IN BY**:

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison

---

[3]The two claims not presented to the circuit court were that petitioner's trial attorney failed to object to testimony that petitioner was overheard threatening to kill a witness and that counsel failed to raise the issue on appeal in *Sherrod I*.

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINA

2017 JUL 31 PM 2:25

STATE OF WEST VIRGINIA, ex rel.
**BRANDON SHERROD,**

*Petitioner,*

v.

**Judge Charles E. King**
**Civil Action 13-P-415**

**DAVID BALLARD, WARDEN,**
**MOUNT OLIVE CORRECTIONAL COMPLEX,**

*Respondent.*

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER

Pending before this Court is the petitioner's amended petition for writ of habeas corpus. Following a review of the entire underlying criminal file in Felony Indictment No. 10-F-185; a review of the amended petition and supporting memorandum of law, and the response; a review of the testimony and argument from the omnibus evidentiary hearing, as well as an examination of the pertinent law, this Court makes the following findings of fact, conclusions of law and final order.

## I.

## FINDINGS OF FACT

1. The petitioner, Brandon Sherrod, also known as "Young Gunna," was charged with first degree murder. He, and Michael Serrano, also known as "White Mike" were accused of murdering James Williams, also known as "Baby Goon" by shooting him with a handgun on November 3, 2009. (Trial Transcript at 24, 45.)

2. Rosemary Lacy, the victim's girlfriend, testified that she had a child with the victim and that on November 3, 2009, she had accompanied the victim to court. The victim was involved in

1

a case in which he allegedly placed beer in a baby's bottle, and was charged with an offense. The girlfriend contended it was a joke. (*Id.* at 107-108.) She described for the jury the victim's friends including Kevin Blount, "Fifty"; Jose Mirandez, "Homicide"; Ivan Marindez, "Gotti"; and Brandon Sherrod. (*Id.* at 109.)

3. The baby involved in the "joke" was the child of Ebony Williams and Jose Mirandez, aka Homicide. (*Id.* at 110.) James Williams, the victim, and Ebony were cousins. (*Id.*) According to Ms. Lacy, Ebony Williams became agitated during the preliminary hearing and made threatening remarks. Those remarks included "It's not fair" and "I'm going to have somebody, you know, do something to him, kill him." Homicide wasn't around; Ms. Lacy believed he was incarcerated. (*Id.* at 111.)

4. After the hearing, Lacy and the victim returned home. They ordered Chinese food and had dinner. The victim went into the kitchen and Ms. Lacy heard gunshots. She grabbed her son, who was in the kitchen with his father, and took the child upstairs. Ms. Lacy yelled back downstairs, the victim did not respond. When she got back to the kitchen, she saw blood on the back of his shirt. The victim was lying down, she flipped him over and after pulling up his shirt, saw "the hole" (*Id.* at 112.) Ms. Lacy tried to get the victim to the hospital, but the victim died. (*Id.* at 113.)

5. Patrolman Kapeluck was among the first to arrive at the crime scene. The victim was lying partially in and partially out of a car; he did not appear to be breathing. An ambulance came and took him to the hospital. (*Id.* at 121-122.) It appeared as if the victim had been shot in the kitchen. The window was damaged by what appeared to be bullet holes. The kitchen light was on. (*Id.* at 122-123.)

2

6. Michelle Bailey was dating Kevin Blount, "Fifty" at the time of the murder. (*Id* at 136.) She knew Serrano, the petitioner, Homicide, and Gotti as friends of Blount. She was told that while the victim was babysitting Ebony and Homicide's baby, the baby drank some beer from his bottle and had to go to the hospital. (*Id* at 137.) Homicide's group was "upset" about that. (*Id* at 138.)

7. She received a call from Blount asking if she knew if anyone had a vehicle he could borrow. (*Id* at 149.) Ms. Bailey picked up Blount and "Tech" and took them to a friend's house. Tech and Blount borrowed the car and left. Ms. Bailey was driving a Malibu that belonged to a Chuck Harless. (*Id* at 150.)

8. After Tech and Blount left in the other car, Ms. Bailey went to the west side McDonald's in the Malibu. While there, she received a call in which Blount told her the borrowed car was overheating. (*Id* at 155.) Blount decided to return that car, and asked Ms. Bailey to give him, the petitioner, and White Mike a ride to go "fight Jay." (*Id*) The witness understood that they wanted to fight Jay because he had put beer in the baby's bottle. (*Id* at 256.)

9. Ms. Bailey drove the petitioner and White Mike to a church. They directed her to wait there. They left walking, and came back in five or ten minutes. The petitioner said "I think I hit him". (*Id* at 156.) Ms. Bailey questioned that because in a fight ". . .you either know you hit him or—you hit him or you didn't hit him." (*Id* at 156.) She kept asking questions, but got no answers. (*Id*) White Mike and the petitioner sat in the back seat of the car. (*Id* at 157.)

10. When she heard the victim had been killed, Ms. Bailey was in the apartment with Fifty, White Mike, the petitioner and Tech. She heard about it from the news, and she looked at them and said ". . .like, how did you kill your friend?" The petitioner laughed and smiled in response to that question. (*Id* at 160-161.) The petitioner told Ms. Bailey that the victim was eating cookies,

3

and walked into the kitchen. When the victim looked up, the petitioner shot him. The petitioner stated to Ms. Bailey that he shot the victim, and laughed about it. (*Id.* at 161-162.)

11. After the murder, the petitioner called Homicide and Ebony, and then took White Mike to New York. (*Id.* at 167.) The petitioner twice threatened to kill Ms. Bailey if she told the police about his involvement in the murder. (*Id.* at 184.)

12. Michael Serrano testified that he knew Kevin Blount "Fifty", Christopher Martinez "Tech" and Jose Mirandez "Homicide" his entire life from growing up in New York. (*Id.* at 190-191.) On or about October 26, he took the bus from New York to Charleston with "Chris." (*Id.*) He met Ms. Bailey and the petitioner. (*Id.* at 193.) He was at the petitioner's house on November 3, 2009. He had ridden to the house in the first borrowed car, which kept overheating. (*Id.* at 194.)

13. The petitioner asked Serrano if he would go with him (the petitioner) to "shoot up somebody's apartment." (*Id.* at 196.) Serrano was armed with a 9 millimeter. The petitioner had a 40 caliber gun. (*Id.* at 196-197.) Serrano and the petitioner got to the apartment by riding with Ms. Bailey. She parked, and Serrano and the petitioner walked into an alleyway. (*Id.* at 198.)

14. Serrano did not know where he was headed, the petitioner knew where he was going. (*Id.* at 200.) Serrano followed the petitioner into an alley. The petitioner had his gun straight up towards the window, against the pane. The petitioner then started firing into the house. The petitioner seemed to have a target in the house. (*Id.* at 201.) The petitioner fired 4 or 5 shots, and Serrano fired his gun once. (*Id.* at 202.) After the shooting, the two walked back to where Bailey was parked. (*Id.* at 203.)

15. When they got to the car, they got in and the petitioner said that he thought he shot someone because he saw the man fall. (*Id.* at 204.) When they got to Ms. Bailey's house, the petitioner told Fifty and Tech that he shot somebody, and that he thought he killed Baby Goon.

4

(*Id.* at 205.) Sherrod said more than once that he ". . .shot him, I feel it, I could feel it." (*Id.* at 206.)

16. During this time, immediately after the murder, Serrano, the petitioner, Fifty, and Tech had a conversation with Homicide, who was in jail. (*Id.*) Serrano had listened to the jail phone call and recognized all the voices on it. (*Id.*)

17. The petitioner bragged he had shot "Baby Goon" and stated that "I shot him, I felt it, I could feel it." (*Id.* at 206-207) The petitioner repeated more than once that he saw "Baby Goon" walk back and forth past the window, and started firing. (These statements by the petitioner were not made in the above-referenced phone call.) The petitioner knew he had killed the victim. (*Id.* at 209.) After the information about the murder was broadcast on the news, the petitioner stated he thought he would have to kill Ms. Bailey. (*Id.* at 210.)

18. Serrano returned to New York where he was arrested and charged with murder some weeks later. (*Id.* at 212.) Serrano explained he had pled guilty to wanton endangerment and included in his plea was an agreement to testify. (*Id.* at 213.)

19. The witness identified each of the voices on the jail phone call. On the call, the petitioner told Homicide that "Some shit is going down, going to write you a letter." (*Id.* at 216.) On the tape, the petitioner spoke only one time, which was about writing the letter. There were no direct, or even indirect admissions or conversations about the murder by any of the participants, only a vague allusion to watching the news and that Baby Goon was the word of the day. (*Id.* at 221.) After getting off the phone, the petitioner stated "I told you I killed him. I knew it. The petitioner said that he saw the victim walk past the window, place cookies on a counter, and that he waited for the victim to come back past the window. The petitioner then began firing. (*Id.* at 209).

5

20. Cross-examination further clarified that Serrano, and the petitioner rode in the back of the car Bailey was driving, with Serrano seated on the driver's side. (*Id.* at 227.) Serrano insisted the only conversation was about shooting the house, not shooting anyone, and the only person he talked to about it was the petitioner. (*Id.* at 229.) On redirect, the witness was asked what he told the police in New York and stated that the petitioner took it in his own mind to shoot someone. Additionally, he told the police that he, Serrano, had fired once, and that the shots had gone through the window. (*Id.* at 230.)

21. Officer Taylor indicated that it would be consistent with the physical findings (including recovered bullets) that one shooter fired five times, and another fired an additional single shot. (*Id.* at 246.) The trajectory of the bullets was level. The shots were not up in the air but aimed at the victim. (*Id.* at 249, 258.)

22. The gunshot residue expert had been performing such analysis since 2002 and had done perhaps thousands of such tests. (*Id.* at 267.) The samples from the Malibu came from the rear driver side seat, the rearview mirror and the driver's door. (*Id.* at 264.) The expert identified residue from those three locations in the Malibu. (*Id.* at 270.)

23. Dr. Mahmoud performed the autopsy. The victim died from a single gunshot wound to the chest which entered and exited from the left side of his chest. (*Id.* at 276.) The shot penetrated the victim's heart and left lung. (*Id.* at 281.)

24. The defense closing challenged the credibility of the witnesses and asserted that the only thing of which the jury could be sure that White Mike was in the alley. (*Id.* at 351.) Counsel also asserted that White Mike may have pulled the trigger because he had a gun with a laser sight, or someone else could have pulled the trigger, but it wasn't the petitioner. (*Id.* at 352.) Counsel pointed out that whoever drove the vehicle had to fire a gun because residue was found on the

6

mirror and driver's door, and that no testimony put the petitioner in the front seat of the car. (*Id.* at 353.)

25. The petitioner was found guilty of murder in the first degree. The jury recommended mercy. (*Id.* at 375.) The petitioner was sentenced in accord with that verdict. (Sentencing Transcript at 6.) The petitioner agreed to have trial counsel reappointed as appellate counsel, stating that he was satisfied with the representation he had received. (*Id.* at 10.)

26. The petitioner filed a direct appeal. By memorandum decision filed November 19, 2012, in Case No. 11-1121, the West Virginia Supreme Court affirmed his conviction. The issues on appeal were the sufficiency of the evidence to convict the petitioner and the trial court's erroneous refusal to grant a mistrial when a witness volunteered that the petitioner had been in jail.

27. The petitioner subsequently filed two *pro se* petitions for writ of habeas corpus. By memorandum decision entered September 19, 2014, in cases 13-1141 and 14-0232, the West Virginia Supreme Court affirmed the summary dismissal of the petitioner's then filed *pro se* petitions, save for the claim of ineffective assistance of counsel. Specifically, with regard to the claims that the admission of the phone call constituted error of constitutional dimension the court noted that "Evidentiary errors do not normally rise to the constitutional level." Nothing in the petitioner's allegations indicated that the evidentiary rulings fell into the "exceptional" case where an evidentiary ruling would constitute error of constitutional dimension. Memorandum decision at *3.

28. The petitioner, with the assistance of counsel, has filed an amended petition, and a supplemental petition with a supporting memorandum of law.

29. The petitioner asserted several claims in his petitions, although the petitioner chose not to proffer evidence on all of those claims. Those claims will be specifically addressed in the

7

conclusions of law section, but this Court will observe, generally, that the petitioner bears the burden of proof as to all claims and that any claim upon which evidence was not presented will be deemed abandoned and unproven.

30. The petitioner asserts that the failure to give a *"Caudill"* instruction was error of constitutional dimension. (*State of West Virginia v. Caudill*, 170 W.Va 74, 289 S.E.2d 748, 1982) The failure to give such instruction, absent a request, is not reversible error. Moreover, failure to give such instruction was an issue that could have been, but was not, raised in the direct appeal. Therefore, the issue is waived. It is not constitutionally required that a *Caudill* instruction be given, even if requested. Failure to give such instruction is, at best, ordinary trial error, not cognizable in habeas. The petitioner acknowledged at the omnibus evidentiary hearing that there was no independent duty on the Court to give such an instruction absent request, and that no instruction had been requested. Therefore, this portion of the *"Caudill"* claim is deemed waived, abandoned and unproven.

31. The petitioner also asserts that trial counsel was ineffective for not requesting such instruction.

32. The petitioner asserts that the state withheld exculpatory evidence, a statement given by the co-defendant to the New York police department. The "statement" of the co-defendant was not admitted into evidence. If, in fact, the co-defendant gave the police the same statement that he testified to at trial, the statement is inculpatory of, and not exculpatory of, the petitioner. Failure of the state to provide a copy of that statement would not be a discovery violation of constitutional dimension because the state is required to provide the defendant with information that is material and exculpatory. It was not ineffective assistance of counsel to fail to obtain such statement for impeachment purposes as there is nothing to indicate that there was impeachment material in that

8

statement. The prosecution's use of such statement would not violate Rule 404(b) because there is no evidence that there was introduction of prior bad acts through such statement. No evidence was proffered during the omnibus hearing as to whether the state had such a statement, whether it was provided to trial counsel, and whether or not it was exculpatory. Therefore, this claim is deemed abandoned and waived. However, the Court will note that a very brief statement from the co-defendant to the New York police appears in the underlying criminal file and that it was inculpatory of the petitioner and consistent with the co-defendant's trial testimony. Moreover, there is nothing to indicate that the state did not provide such statement in discovery.

33. The petitioner asserts that trial counsel was ineffective in dealing with the issue of gunshot residue. The testimony was that gunshot residue was found in the front seat of the vehicle that the petitioner was in before and after he murdered the victim. The expert testimony regarding the residue did not tie the residue to the petitioner, but to the car. Petitioner cannot show that another expert would have disagreed with the state's expert. Moreover, nothing in the expert's testimony tied the residue directly to the petitioner. Choosing not to cross-examine a witness from whom testimony has been elicited which is not particularly damning is a reasonable strategic decision, not ineffective assistance. Additionally, again, it cannot be demonstrated that the result of the trial would have differed had there been more cross-examination.

34. The telephone call was not testimonial in nature—that is, it was not procured by any state agency for use in lieu of trial testimony. The petitioner was a participant in the telephone conversation. Anyone familiar with the voices could identify the participants and authenticate the call. The petitioner is not claiming the call was not made nor claiming the petitioner did not participate in the call. Further authentication than what was proffered at trial was not necessary. As to any portions in Spanish, the petitioner fails to articulate any prejudice from the failure to

9

have those portions translated. Therefore, the petitioner cannot demonstrate that a reasonably objective lawyer would have required any more authentication before the phone calls were played for the jury, and cannot demonstrate that but for the failure of trial counsel to challenge authentication or require translation, the result of the trial would have differed. The Court will also note that the testimony of petitioner's legal expert, who generally eschewed any opinion as to the "prejudice" prong of the *Strickland/Miller* standard opined that the petitioner had not demonstrated prejudice resulting from the phone call, and its lack of translation, because there is only speculation as to what the Spanish portions of the call contained and no evidence any juror spoke Spanish.

35. An omnibus evidentiary hearing was held. At the hearing, Ed Bullman, trial counsel and Martin Sheehan, denoted an expert witness on ineffective assistance of counsel testified.

36. At the evidentiary hearing the petitioner acknowledged that he had filled out a *Losh* list and that he understood all issues not raised were waived for the purpose of seeking relief in the future. (Omnibus Hearing Transcript, May 18, 2017 at 5.)

37. Counsel proffered that the issues being litigated were the failure of the Court to give a *Caudill* instruction, ineffective assistance of counsel regarding the gunshot residue testing and testimony, ineffective assistance of counsel regarding the jail phone call as regards identification, verification and translation, ineffective assistance of counsel for failing to request the *Caudill* instruction, ineffective assistance of appellate counsel for failing to raise the *Caudill* instruction issue on direct appeal, and cumulative error. (Id. at 5-8.)

38. The petitioner acknowledged that he understood that by raising the issue of ineffective assistance of counsel he was waiving the privilege of confidential communications. (Id. at 9.)

10

39. The petitioner called Martin Sheehan as an expert witness. Counsel for the respondent noted that it accepted Mr. Sheehan's qualifications as an "expert" although noting the oddity of an expert witness to assist the Court, as trier of fact, when the Court had been a practicing lawyer and judge longer than the expert. (Id. at 10.)

40. Mr. Sheehan stated he had not reviewed the transcript of the criminal trial in this matter. (Id. at 12.)

41. Mr. Sheehan stated that he believed he could testify only as the standard of care required of a practitioner and could not opine as to any prejudice resulting from a deviation from the standard of care. (Id. at 15.)

42. Mr. Sheehan believed that it was a violation of that standard of care for trial counsel to fail to request the *Caudill* instruction at petitioner's trial. (Id. at 16.)

43. Although he did not read the trial transcript, Mr. Sheehan opined that trial counsel had failed to make clear to the jury the temporary nature of gunshot residue. (Id. at 17.) As a factual matter, and legal conclusion, this Court disregards that opinion because Mr. Sheehan did not read the trial transcript and does not know what evidence, cross-examination and argument the jury actually heard in this matter regarding gunshot residue.

44. Although the expert believed the failure to have the phone call translated "problematic" he opined that the translation issue did not prejudice the petitioner. The petitioner could not prove that translation, or the lack thereof had a substantive effect on the outcome because the contents of the conversation are still unknown. "And so I somewhat reluctantly include in my report that I don't think the defendant can show prejudice in that regard at all." (Id. at 19.)

45. The expert believed that it was a "problem" that trial counsel had not requested the *Caudill* instruction. (Id. at 20.)

11

46. The expert did not render an opinion about whether appellate counsel was ineffective for failing to raise the *Caudill* issue on appeal because generally one could not raise on appeal an issue that was not perfected below. (Id. at 21.)

47. Mr. Sheehan did not express an opinion as to whether or not the issues amounted to prejudicial cumulative error. (Id.)

48. Counsel for petitioner acknowledged that the issues opined about and litigated were the ineffective assistance of trial counsel in failing to request a *Caudill* instruction and ineffective assistance in handling the gunshot residue. The witness did not state that the handling of the phone call amounted to ineffective assistance of counsel and habeas counsel acknowledged that as to the phone call ineffective assistance on that issue was not proven. Further, the expert did not opine that appellate counsel was ineffective. (Id. at 22-23.)

49. Mr. Sheehan acknowledged that the burden of proof in this matter rested on the petitioner. Further, the petitioner bore the burden of demonstrating that counsel by an act or omission did or did not do something that was objectively deficient performance. Also, the petitioner had to prove that the act or omission affected the outcome of the proceeding. (Id. at 24.)

50. Mr. Sheehan agreed that the respondent prevailed by demonstrating either that it was not objectively deficient performance or, that, no matter how defective the performance it did not affect the result of the proceeding. (Id. at 24-25.)

51. Mr. Sheehan acknowledged that strategic decisions with very, very limited exception could not provide the basis for ineffective assistance of counsel. (Id. at 26.)

52. The expert reiterated that as to the lack of translation of the phone call the claim was "significantly" weak as to prejudice. (Id.)

12

53. Mr. Sheehan acknowledged that he did not know what the jury actually heard regarding gunshot residue. (Id. at 27.)

54. Mr. Sheehan had no reason to doubt the accuracy of the gunshot residue testing or testimony. (Id. at 27-28.)

55. The expert acknowledged that the primary locus of the gunshot residue was associated with the driver of the vehicle. He also acknowledged that the fact that the jury heard that Michelle Bailey drove the car, the co-defendant was in the rear seat behind the driver and the petitioner was on the passenger rear seat, significantly limited any potential prejudicial impact on petitioner's case from the gunshot residue evidence. (Id. at 29.)

56. Mr. Sheehan attempted to opine that the defense needed an expert simply because the state had one (id. at 30) but acknowledged that he again, had no idea on what emphasis was or was not placed on the gunshot residue testimony. (Id.)

57. Mr. Sheehan stated he had not read the memorandum decision from the West Virginia Supreme Court of Appeals affirming the petitioner's conviction. (Id. at 31.)

58. Mr. Sheehan opined that it was his reading of *Caudill* that the obligation was on counsel to ask for the instruction and there was no duty on the judge to give the instruction *sua sponte*. (Id. at 31-32.)

59. Mr. Sheehan agreed that, in a general sense, there could be sound strategic reasons for not requesting a limiting instruction. (Id. at 32.) However, he seemed to suggest that in the area of a limiting instruction regarding a co-defendant's testimony that there never could be a sound strategic reason for not requesting a limiting instruction. (Id. at 34.) Counsel for the respondent noted—and this Court agrees—that the West Virginia Supreme Court in its *Flack* decision stated

13

that ". . .defendants may actually be better off waiving the limiting instruction than highlighting something that hurts." (Id.)

60. Mr. Sheehan reiterated that he believed the failure to request the limiting instruction and the handling of the gunshot residue testimony were deviations from the standard of care, but that he would not express an opinion as to the prejudicial nature of that deviation. Mr. Sheehan testified that the petitioner was unable to demonstrate that there was any prejudice from the failure to have the phone call translated. He further expressed no opinion as to the prejudicial nature of any cumulative error. (Id. at 36.)

61. On re-direct, Mr. Sheehan clarified that he would not necessarily have called an independent expert regarding the gunshot residue but would have attempted to use the state's expert to ensure that the jury understood the limitations of the gunshot residue evidence. (Id. at 37.)

62. Mr. Sheehan acknowledged that the quotations contained in the pleadings regarding testimony at trial were not an adequate substitute for the trial transcript itself. (Id. at 38.)

63. He also agreed that his assumptions about what the jury heard about the gunshot residue may be incorrect and that he did not know what the jury actually heard about the gunshot residue. (Id. at 39.)

64. Trial counsel testified. He stated that he had not reviewed the trial transcript but he remembered the case, what he did and didn't do, and his theory of the case. (Id. at 41.)

65. As to the lack of a *Caudill* instruction, trial counsel said it was an oversight on his part not to request that instruction. (Id. at 42)

66. As to the gunshot residue testimony, counsel testified that his handling of the testimony was a strategic decision because the gunshot residue evidence was consistent with the defense

14

theory of the case which was that the petitioner was being blamed for the actions of the guys from New York. (Id.)

67. The theory was that not only did the New York guys get together to kill the victim but also to place the blame on the man from West Virginia. (Id. at 43.)

68. The testimony of the state's witness regarding the gunshot residue was consistent with the defense theory and the defense argument. (Id. at 43.)

69. The defense did not seek its independent expert because he could use the state's expert to support the defense case. Trial counsel believed the gunshot residue testimony in totality supported the defense position. (Id. at 44.)

70. Trial counsel believed it was better to rely on the state's expert and that he would have gained nothing by hiring another expert. (Id. at 44-46.)

71. Trial counsel stated that he did not want to ask questions about why there was no gunshot residue where his client was seated because his experience with such testimony in other cases was that the expert would be able to explain away the absence of residue and it was better to leave it alone. (Id. at 46.)

72. As to the telephone call, trial counsel did not remember anything in the conversation that was helpful or hurtful and that it supported his theory of the case of New York guys doing the killing and blaming it on the West Virginia guy. (Id. at 47.)

73. Although counsel believed he should have requested a limiting instruction, he acknowledged that the driver of the car provided testimony that corroborated the co-defendant and that was damaging, particularly regarding the admission the petitioner made about having killed the victim. (Id. at 50.)

15

74. Trial counsel did not know whether the failure to have the limiting instruction affected the jury's decision at all. (Id. at 51.) At closing, he believed that he observed members of the jury nodding in agreement with his argument and believed that at least some of the jurors were leaning his way. (Id.)

75. Mr. Bullman believed that he cross-examined the co-defendant about the sweetheart deal he got, and that he had to tell the prosecution what they wanted to hear or he wouldn't get the benefit of that deal. (Id. at 52.)

## II.

## CONCLUSIONS OF LAW

1. Jurisdiction and venue are properly in Kanawha County pursuant to Rule 3 of the Post-Conviction Rules regarding proceedings in habeas corpus.

2. "Habeas corpus proceedings are civil proceedings. The post-conviction habeas corpus procedure provided for by Chapter 85, Acts of the Legislature, Regular Session, 1967, is expressly stated therein to be 'civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case.'" *State ex rel. Harrison v. Coiner*, 154 W. Va. 467, 476, 176 S.E.2d 677, 682 (1970). The burden is on the petitioner to prove his claims by a preponderance of the evidence.

3. The petitioner proffered that one of the six grounds that he was pursuing was the failure of the Court to give a *Caudill* instruction regarding the plea agreement of the co-defendant. The Court finds that there was no independent duty on its part to offer the limiting instruction without request even prior to the modification of *Flack.* The petitioner's expert also opined there was no such duty. Therefore, the petitioner has failed in his burden of proof regarding this assertion of error. Moreover, in general, the giving or omitting of any instruction is reviewed as to the abuse

16

of discretion standard, and the failure to give or omit any instruction, generally does not rise to the level of a constitutional violation. The defense requested no such instruction; the court had no duty to give such instruction. This contention affords the petitioner no relief.

4. As noted above, the petitioner proffered several issues in his pleadings and chose not to offer evidence as to some of them. The court finds that the petitioner presented no evidence as to whether the state withheld a statement from the co-defendant to the New York police, whether the introduction of that statement violated Rule 404(b) and whether counsel was ineffective for not having the statement. No evidence was taken at all regarding that statement. The petitioner has failed in his burden of proof to demonstrate that his counsel was ineffective in dealing with the statement or that the state committed a constitutional violation by withholding exculpatory information. As the petitioner has failed to prove this contention, it affords him no relief.

5. Although the issue of whether counsel was ineffective for not having the phone call translated was litigated, the petitioner presented no evidence on whether or not it was ineffective assistance to stipulate to the authenticity of the phone calls and presented no evidence to suggest that the phone call was testimonial in nature. As there is no evidence of record to support the claim that counsel should not have stipulated to the phone call and no evidence of record that suggests the phone call was testimonial in nature, the Court deems that the petitioner has abandoned those claims. The claim that counsel should not have stipulated to authenticity and that the calls were testimonial in nature are not proven, not supported by the evidence and afford the petitioner no relief.

6. The Court will now address those claims upon which evidence was taken. Those claims deal in large measure with ineffective assistance of counsel. There are several general principles regarding habeas proceedings in general and ineffective assistance of counsel in particular.

17

7. West Virginia Code §53-4A-1 provides for post-conviction habeas relief for "[a]ny person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both."

8. The contentions and the grounds in fact or law must "have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings in a prior petition or petitions under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence." West Virginia Code §53-4A-1.

9. West Virginia's post-conviction habeas corpus statute "clearly contemplates that [a] person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding." Syl. Pt. 1, *Markley v. Coleman*, 215 W.Va. 729, 601 S.E. 2d 49 (2004) (citations omitted). Such proceeding gives the Petitioner an opportunity to "raise any collateral issues which have not previously been fully and fairly litigated." *Coleman* at 732, 601 S.E.2d at 52. The initial habeas corpus hearing is *res judicata* as to all matters raised and to all matters known or which, with reasonable diligence, could have been known. Syl. Pt. 2, *Coleman, supra.*

10. The habeas corpus statute "contemplates the exercise of discretion by the court." *Perdue v. Coiner*, 156 W. Va. 467, 194 S.E.2d 657 (1973).

11. The circuit court denying or granting relief in a habeas corpus proceeding must make specific findings of fact and conclusions of law relating to each contention raised by the petitioner. *State ex rel. Watson v. Hill*, 200 W. Va. 201, 488 S.E.2d 476 (1997).

18

12. "A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. Pt. 4, State *ex rel. McMannis v. Mohn*, 163 W. Va. 129, 254 S.E.2d 805 (1979). Moreover, "[t]he sole issue presented in a habeas corpus proceeding by a prisoner is whether he is restrained of his liberty by due process of law." Syl. Pt. 1, *State ex rel. Tune v. Thompson*, 151 W. Va. 282, 151 S.E.2d 732 (1966).

13. A circuit court having jurisdiction over habeas corpus proceedings has broad discretion in dealing with habeas corpus allegations. *Markley, supra* at 733, 601 S.E.2d at 53. It may deny the petition without a hearing and without appointing counsel if the petition, exhibits, affidavits and other documentary evidence show to the circuit court's satisfaction that the Petitioner is not entitled to relief. Syl. Pt. 3, *Markley, supra*. A circuit court may also find that the habeas corpus allegation has been previously waived or adjudicated and if so, the court "shall by order entered of record refuse to grant a writ and such refusal shall constitute a final judgment." *Markley, supra*, at 733, 601 S.E. 2d at 53 (2004) (citations omitted). (citing W.Va. Code section 53-4A-3(a)).

14. When determining whether to grant or deny relief, a circuit court is statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by the petitioner and to state the grounds upon which each matter was determined. Syl. Pt. 4, *Markley, supra*. *See also* W.Va. Code §53-4A-3(a).

15. The petitioner has knowingly, voluntarily, and understandingly raised certain issues as enumerated above, and knowingly, voluntarily, and understandingly waived all other issues.

16. Claims of ineffective assistance begin and in large measure end with the standards set forth in *Strickland/Miller*.

17. West Virginia evaluates an ineffective assistance of counsel claim under the two-prong standard set forth by the Supreme Court of the United States in *Strickland v. Washington*. Syl. Pt.

19

5, *State v. Miller*, 194 W. Va. 3, 459 S.E. 2d 114 (1995) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To succeed on such a claim, a petitioner must establish that: 1) his trial counsel's "performance was deficient under an objective standard of reasonableness; and 2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*Id.*) "Failure to meet the burden of proof imposed by either part of the *Strickland/Miller* test is fatal to a habeas petitioner's claim." *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 528 S.E. 2d 207 (1999).

18. The *Strickland* standard is not easily satisfied. *See Miller*, 194 W. Va. at 16 ("[T]he cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between."), *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 319, 465 S.E. 2d 416, 421 (1995)(ineffective assistance claims are "rarely" granted and only when a claim has "substantial merit"), *see also*, *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005)("Petitioners claiming ineffective assistance of counsel under *Strickland* have a heavy burden of proof.").

19. In *Miller*, the court outlined the challenge faced by a petitioner claiming ineffective assistance, noting that judicial review of a defense counsel's performance "must be highly deferential" and explaining that there is a strong presumption that "counsel's performance was reasonable and adequate." *Miller*, 194 W.Va. at 16, 459 S.E.2d at 127. Moreover, the *Miller* court held that there is a "wide range" of performance which qualifies as constitutionally-adequate assistance of counsel, stating:

> A defendant seeking to rebut th[e] strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a 'wide range.' The test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue

20

*Id.*, *see also Vernatter*, 207 W. Va. at 17, 528 S.E.2d at 213 ("[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . .'") (quoting *Strickland*, 466 U.S. at 689).

20. A petitioner claiming ineffective assistance must identify the specific "acts or omissions" of his counsel believed to be "outside the broad range of professionally competent assistance." *See Miller*, 194 W. Va. at 17, 459 S.E.2d at 128, *State ex rel. Myers v. Painter*, 213 W. Va. 32, 35, 576 S.E.2d 277, 280 (2002)("The first prong of [the *Strickland*] test requires that a petitioner identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment)(internal quotation marks omitted).

21. The reviewing court is then tasked with determining, "in light of all the circumstances" but without "engaging in hindsight," if that conduct was so objectively unreasonable as to be constitutionally inadequate. *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128. "As we explained in *Miller*, 'with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel.' *Id* at 17, 459 S.E.2d at 128. '[P]erfection is not the standard for ineffective assistance of counsel.' *Id* Only if an identified error is 'so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment' is the first prong of the *Strickland* test satisfied. *Strickland*, 466 U.S. at 687." *Flack v. Ballard*, 2017 W. Va. LEXIS 447, *22

22. Strategic choices and tactical decisions, with very limited exception, fall outside the scope of this inquiry and cannot be the basis of an ineffective assistance claim. *Legursky*, 195 W. Va. at 328, 465 S.E.2d at 430 ("A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness.")(internal quotation marks omitted), *Miller*, 194

21

W. Va. at 16, 459 S.E.2d at 127 ("What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

23. Identifying a mere mistake by defense counsel is not enough. *See Edwards v. United States*, 256 F.2d 707, 708 (D.C. Cir. 1958) ("Mere improvident strategy, bad tactics, mistake, carelessness or inexperience do not . . . amount to ineffective assistance of counsel, unless taken as a whole the trial was a 'mockery of justice.'"). As the *Miller* court noted, "with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel;" however, the court continued, "perfection is not the standard for ineffective assistance of counsel." *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

24. Even if defense counsel's conduct is deemed objectively unreasonable, and therefore satisfies the first *Strickland* prong, that conduct does not constitute ineffective assistance unless the petitioner can also establish that the deficient conduct had such a significant impact that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, *Miller, supra*. As the Supreme Court explained in *Strickland*, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Thus, satisfying *Strickland's* "prejudice prong" requires a showing that counsel's deficient performance was serious and impactful enough to "'deprive the defendant of a fair trial, a trial whose result is reliable.'" *State ex rel. Strogen v. Trent*, 196 W. Va. 148 at n. 4, 469 S.E.2d 7, 12 (1996) (quoting *Strickland*, 466 U.S. at 687), *see also Myers*, 213 W. Va. at 36, 576 S.E.2d

22

at 281 (2002) ("The second or "prejudice" requirement of the *Strickland / Miller* test looks to whether counsel's deficient performance adversely affected the outcome in a given case.").

25. There is no precise formula, applicable in all cases, that can be applied to determine if the constitutionally-inadequate conduct in question so significantly degraded the reliability of the trial such that the prejudice prong is satisfied. *See Legursky*, 195 W. Va. at 325, 465 S.E.2d at 427 ("Assessments of prejudice are necessarily fact-intensive determinations peculiar to the circumstances of each case."). But there is no question that the burden of demonstrating prejudice lies with the petitioner. *Strickland*, 466 U.S. at 693, *Legursky*, 195 W. Va. at 319, 465 S.E.2d at 421.

26. This Court will quickly dispense with the claim that cumulative errors at petitioner's trial or by his counsel resulted in an unfair proceeding entitling him to relief. As will be more fully discussed below, this Court finds that counsel may have been objectively deficient in not requesting the *Caudill* instruction. However, this Court also finds that omission did not affect the result of petitioner's trial. Therefore, there was no error, much less cumulative error in these proceedings.

27. The court finds that the petitioner has failed to satisfy his burden of demonstrating that any error occurred. Therefore, the doctrine of cumulative error is completely inapplicable. That standard applies both to the asserted errors committed by counsel and also to the asserted stand-alone errors at trial. Where the record a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error. Syl. Pt. 14, *State v. Foster*, 221 W.Va. 629, 656 S.E. 2d 74 (2007). The cumulative error doctrine is not applicable without legal and/or factual basis which support the individual assignments of

23

error. *See State v. Glaspell*, 2013 WL 3184918 (W.Va. June 24, 2013). The cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors. *State v. Knuckles*, 196 W.Va. 416, 426, 473 S.E.2d 131, 141 (1996). Because Petitioner fails to meet his burden of establishing counsel's errors in defending his case, or the court's error at trial, the doctrine of cumulative errors does not apply. Moreover, "As respondent notes, this Court has not expressly extended the cumulative error doctrine to evidentiary decisions or rulings in post-conviction habeas proceedings. We decline to do so here." *DeGasperin v. Ballard*, , 2017 WL 663577 (W. Va. Supreme Court of Appeals Memorandum Decision, Feb. 17, 2017).

28. This Court will now address those claims upon which evidence was proffered. Those claims, specifically, are ineffective assistance of counsel in the handling of the issue of gunshot residue at trial, the failure to have the phone call translated, and the failure to request a limiting instruction regarding the co-defendant's testimony.

29. The issue of ineffective assistance of counsel implicates both state and federal constitutional rights and the issue is being decided on both state and federal constitutional grounds.

30. As to the phone call, trial counsel testified that he was unaware of anything exculpatory or inculpatory on that phone call. He did not seek translation because the conversation in Spanish, excluding his client, supported the defense theory of the case. This Court will not engage in speculation that there was something harmful to the petitioner on that phone call and that counsel should have had it translated. The Court must point out that habeas counsel did not have the conversation translated and has not proffered that there was any information germane to petitioner or his defense on that phone call. The burden is on the petitioner to demonstrate both prongs of the *Strickland/Miller* standard. That is, petitioner bears the burden of proving that his counsel

24

engaged in objectively deficient performance AND that the error or omission affected the result of the proceeding to petitioner's prejudice. Even petitioner's expert, who abstained from commenting on the prejudice prong in other respects stated that petitioner could not prove prejudice in relation to the phone call. Such failure is fatal to petitioner's claim. Moreover, the Court does not find that failure to have the call translated was objectively deficient performance. The Court is aware that for strategic reasons it is sometimes better not to know, particularly if the contents of the phone call were harmful to the petitioner.

31. Moreover, the petitioner's participation in the phone call was very limited, and the statement made by him non-inculpatory. The petitioner stated only that he was going to write Homicide a letter. The whole conversation did not contain any admissions or accusations about the death of James Williams. The phone conversation further bolstered the defense contention that it was the gang from New York who murdered James Williams, and not his friend from Charleston, W. Va. Moreover, the fact that part of the conversation was in Spanish also bolstered that theory. Trial counsel noted that there was no real idea what "they" were saying on the tape but the only people who knew were the brothers or White Mike and ". . .he is just not telling us what they were telling each other" and that White Mike was the one who was laughing during the phone call about a murder, someone being taken out, recalling the good times with his buddy. (Trial Transcript at 354.) The fact that some of the phone call was in Spanish, apparently excluding the petitioner from participation in the conversation only served to reinforce the defense contention that Sherrod was the outsider set up to take the fall for the gang from New York.

32. That choice of strategy was objectively reasonable. The phone call was sufficiently authenticated, and therefore it was not ineffective assistance of counsel to challenge the authenticity of a phone call which was clearly authenticated by one of the participants in the

25

conversation. There is no evidence that any of the conversation in Spanish was any more germane to the case at bar than the English parts of the conversation. One could speculate about what the Spanish speakers were saying, but there is no evidence that portion of the conversation was exculpatory of the petitioner either in terms of impeachment or otherwise. The conversation could also have been completely inculpatory of the petitioner, with the conversation consisting of repetition of admissions that the petitioner had made. The Court takes note that know the contents of the call remain unknown and untranslated, so the petitioner cannot prove the failure to have it translated was prejudicial.

33. It was not objectively deficient for trial counsel to fail to clarify the garbled contents of the jail phone call, including the portion in Spanish. The jail phone call was not incriminatory of the petitioner, and the circumstances of the phone call, including the group from New York telling Homicide to watch the news, and that Baby Goon was the word of the day, as well as speaking in Spanish, served to reinforce the defense theory that the petitioner was the fall guy, not part of the group.

34. Moreover, there is nothing to demonstrate that had the phone call been translated that there was anything beneficial to the petitioner on that phone call, or that even if there was some cryptic reference that was beneficial to the petitioner the result of the trial would have differed.

35. The Court finds that it was not objectively deficient performance to fail to have the tape translated and played for the jury in English. Additionally, the Court finds that the petitioner has failed to demonstrate prejudice. The petitioner has satisfied neither prong of *Strickland/Miller* in regards to this particular claim of ineffective assistance of counsel, and this assertion affords him no relief.

26

36. The petitioner challenges the performance of trial counsel with regard to the gunshot residue testimony by asserting that trial counsel should have hired an expert to challenge the state's expert, and further should have cross-examined the witness more vigorously regarding the gunshot residue. "While counsel's general duty to prepare necessitates an investigation of the facts, there is no constitutional demand that an investigator be hired or for experts to be retained in every case." *Flack v. Ballard*, 2017 W. Va. LEXIS 447, *25-26

37. Again, as noted above, how to cross-examine a witness, what questions to ask is the essence of a strategic decision which will rarely, if ever, constitute ineffective assistance of counsel. Defense counsel developed a coherent strategy which was to acknowledge that the victim had been murdered in his own kitchen, but to point out that the petitioner lacked motive. In opening, trial counsel pointed out that the victim was alleged to have caused harm, or attempted harm against the child of Ebony Williams and Homicide. Homicide was in jail. Shortly before the murder, Homicide's buddies from New York came south including White Mike, Tech and Fifty. Fifty, Homicide, Tech, and White Mike are all from the same project in New York and have come south to "show some love for their friend who is in jail." (Trial Transcript at 88.) "All of the people with a motive, all of the people connected to Homicide are from New York." "There is no motive at all, no reason, for Brandon Sherrod to have any ill-will against this guy. They had actually been friends." (*Id.* at 89.) All of the individuals who actually made threats against the victim, all of whom have motive, all of the ones from New York were the ones testifying against Sherrod. Sherrod was the one taking the fall for the guys from New York, those who fled the state after the shooting. (*Id.* at 90-91)

38. The gunshot residue testimony elicited at trial actually supported the defense theory. That is, the evidence demonstrated that gunshot residue was found on the rear view mirror, the

27

driver's door, and the passenger door on the driver's side. Counsel developed that Michelle Bailey was the driver—not the petitioner, and that Serrano sat behind the driver—not the petitioner. Therefore, even if the jury chose to believe that the petitioner was in the car, the evidence was that the gunshot residue was not associated with him. The evidence tended to demonstrate that the person (or persons) who shot guns were on the driver's side, not on the passenger's side where the evidence placed the petitioner. Trial counsel highlighted this for the jury by asking who drove the vehicle, noting that it was someone who fired a gun, which did not match the testimony of either Serrano or Bailey. No one put the shooters in the front seat driving, adjusting the mirror. Certainly no one put the petitioner in the front seat.

39. Therefore, since the gunshot residue evidence supported the defense theory that the petitioner was not involved, not in the car, or at worst in the car but not associated with the area of the car where the gunshot residue was found, it was objectively reasonable performance for counsel to limit his cross-examination to those answers which supported the defense. Moreover, the result of the trial would not have differed had counsel hired an independent expert nor asked more questions on cross-examination. The petitioner's expert opined that counsel was objectively deficient, yet did not know what evidence the jury actually heard regarding gunshot residue. The Court rejects the defense contention that counsel was objectively deficient in his handling of the gunshot residue issue, and further finds that hiring an expert or asking different questions would not have affected the result of the proceeding. The petitioner cannot satisfy either prong of *Strickland/Miller* and this claim affords no relief.

40. The Court accepts trial counsel's statement that the reason a *Caudill* instruction was not requested was because of oversight, not because of any strategic reason. The Court therefore will find that the failure to request such instruction was objectively deficient performance. That

28

does not end the inquiry, because the failure to request such limiting instruction must have adversely affected the trial.

41. This Court is of the opinion that the failure to request such limiting instruction had no effect on the jury verdict.

42. The Court will note that in fact, asking for and receiving a limiting instruction can have the effect of highlighting harmful evidence and make a juror give such evidence more weight than it deserves.

43. The petitioner was not convicted because of the lack of a *Caudill* instruction but was convicted because the jury believed the testimony of Serrano and Bailey as to *facts* which each observed, including witnessing the murder and hearing the petitioner boast about the crime.

44. When a criminal defendant's accomplice - who has pled guilty to the charge upon which the defendant is being tried - testifies as a witness for the State, it is permissible for the State to elicit testimony about the accomplice's guilty plea. See *State v. Caudill*, 170 W. Va. 74, 78, 289 S.E.2d 748, 752 (1982).

45. It is impermissible for the state to elicit testimony which would tend to lead a jury to believe that a co-defendant's guilty plea is substantive evidence of guilt for the defendant on trial. However, the West Virginia Supreme Court reasoned in *Caudi*ll that "where the testimony regarding the plea is but a small part of an accomplice's testimony" and the accomplice's testimony is otherwise "general and extensive in nature," the prejudice caused by such testimony is limited. *See Caudill*, 170 W. Va. at 81, 289 S.E.2d at 755. *Caudill* mandated the issuance of a limiting instruction to ensure that a jury did not "misinterpret the purpose for which testimony [concerning a guilty plea] is offered." *Id. Flack* recognized that a limiting instruction might only draw attention to an otherwise innocuous mention and that it is better for defense counsel to determine when

29

testimony concerning a plea is of the character that it might be misconstrued by the jury (and thus warrant a limiting instruction). See *Flack*, 232 W. Va. at 713, 753 S.E.2d at 766.

46. This Court is aware that counsel simply did not ask for the instruction, rather than making a choice. However, this Court believes that requesting the limiting instruction would have highlighted damaging testimony and been prejudicial to petitioner's case, and that the absence of such request did not prejudice petitioner.

47. A review of the trial transcript in this case demonstrates that Serrano's testimony concerning his plea did not fall into the category of testimony for which a limiting instruction is absolutely necessary. Serrano's transcript covers some 40 pages of the trial transcript. When questioned by the state, he simply stated the parameters of his plea agreement. His credibility was assailed on cross-examination because of the benefits of the plea. However, the state did not elicit lengthy testimony regarding the plea and no suggestion was ever made to the jury that the petitioner was guilty simply because Serrano had entered a plea. Serrano was extensively cross-examined about his favorable plea, a strategic decision designed to demonstrate a motive for lying about petitioner's participation in the murder. A case cited in *Caudill* is illustrative. In *State v. Cole*, 252 Or. 146, 448 P.2d 523 (1968), the Supreme Court of Oregon explained that where the "purpose of the [accomplice's] testimony was to give the facts and circumstances of the crime" and that any testimony concerning a plea agreement was primarily intended to explain "the circumstances under which [the accomplice was] testifying" that testimony was highly relevant to "their credibility as witnesses for the state." *Cole*, 252 Or. at 153-54, 448 P.2d at 527 (quoted in *Caudill*, 170 W. Va. at 81, 289 S.E.2d at 755). Elaborating on this point, the *Caudill* court explained that eliciting testimony about a plea agreement is permissible because "'the jury [is] entitled to the information for its bearing on the value of the witness' testimony, and the prosecution might indeed on occasion

30

suffer unfairly in the estimation of the jury for attempting to conceal the criminal record if it did not come forward with it.'" *Caudill*, 170 W. Va. at 81, 289 S.E.2d at 755 (quoting *Commonwealth v. Cadwell*,374 Mass. 308, 312, 372 N.E.2d 246, 249 (1978)). As the *Caudill* court noted, "[t]he question of ... credibility ... is clearly a proper purpose" for which such testimony could be admitted. *Caudill*, 170 W. Va. at 81, 289 S.E.2d at 755. Thus, testimony elicited primarily to aid the jury's credibility determination should be deemed admissible, even in the absence of a limiting instruction. The fact that Serrano had pled guilty was not revisited or harped on, and Serrano proceeded to provide wide-ranging testimony concerning his personal knowledge of the incident in question. Thus, it is clear that the State did not elicit testimony about Serrano's guilty plea with the intent of relying on that testimony as substantive evidence. Therefore, trial counsels' decision not to request a limiting instruction was not ineffective assistance. The West Virginia Supreme Court very recently addressed the issue of prejudice regarding the failure to request a *Caudill* instruction. "Accordingly, it is clear from the record that the State did not elicit testimony about Mr. Montgomery's guilty plea with the intent of relying on that testimony as substantive evidence. Therefore, because Petitioner has failed to demonstrate that defense counsel's decision not to request a limiting instruction was so prejudicial as to change the outcome of the trial, we affirm the habeas court's ruling on this issue." *Flack v. Ballard*, 2017 W. Va. LEXIS 447, *32. The factual situation is almost identical in the case at bar.

48. Ineffective assistance requires proof that the act or omission resulted in prejudice to the petitioner. In this case, Serrano's detailed testimony about the crime and his participation in it, corroborated by the physical evidence and by Bailey's testimony, coupled with Bailey's testimony about petitioner's damaging admissions about killing the victim convicted the petitioner, not the brief reference to the plea agreement, which the jury needed to hear in order to determine

31

credibility. The failure to request the instruction was not prejudicial and this contention affords the petitioner no relief.

49. As to the issue of ineffective assistance of trial counsel, the Court notes that petitioner's expert testified that appellate counsel was not ineffective because he was bound by the record in the trial. Therefore, the petitioner has failed in his burden of proof on this issue. This Court also does not believe that the Supreme Court would have reversed this petitioner's conviction had the issue of the *Caudill* instruction been proffered on appeal because the Supreme Court was presented with precisely that issue in *Flack* and declined to reverse Flack's conviction.

50. This petitioner received a fair trial with the effective assistance of counsel. The petitioner has failed to prove any of his contentions, and relief in habeas corpus is not warranted.

## III.

## CONCLUSION

THEREFORE, based upon a thorough and complete review of the complete contents of the criminal case file in this matter, including the trial transcripts; in consideration of the testimony at the omnibus evidentiary hearing, and considering the arguments of counsel for the petitioner and the warden both at the hearing and in written submissions, it is ORDERED that the petition seeking a writ of habeas corpus be and the same is hereby DENIED. It is further ORDERED that said civil action be and the same is hereby DISMISSED. The court notes the exceptions and objections of the petitioner. It is further ORDERED that the Clerk of the Circuit Court send copies of this order to counsel of record.

ENTERED: 7-31-17

JUDGE CHARLES E. KING, JR.
Judge of the Thirteenth Judicial Circuit.

32

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF THE CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS
DAY OF August 2017
CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA